**Wilfred SANGSTER, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education & Welfare, Defendant.**

Civ. A. No. 4417.

United States District Court
W. D. Michigan, S. D.

Feb. 4, 1964.

Wilfred Sangster, in pro. per.

George E. Hill, Dist. Atty., Grand Rapids, Mich., for defendant.

FOX, District Judge.

Claimant seeks review of the final decision of the Secretary which denied to

the claimant the establishment of a period of disability under 42 U.S.C.A. § 416 (i) and disability insurance benefits under § 423.

Claimant's action rests on 42 U.S.C.A. § 405(g), which states:

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

Defendant has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, claiming that under section 405(g) there remains only a question of law—whether or not there is substantial evidence to support the Secretary's finding of fact.

The Circuit Court of Appeals has recognized that this is in substance a question of law, but has not hesitated to carefully review the facts supporting the findings; and where they do not substantially support the Secretary's findings, the Circuit Court has not hesitated to reverse. Hall v. Celebrezze, 314 F.2d 686 (C.C.A. 6, March 1963); Rice v. Celebrezze, 315 F.2d 7 (C.C.A. 6, March 1963).

The Social Security Act defines "disability" in 42 U.S.C.A. § 423(c) (2):

"(2) The term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required."

The crucial inquiry is: are the findings of the examiner supported by substantial evidence?

How much evidence is substantial evidence? In N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, substantial evidence was said to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." More helpful is the discussion in Carpenter v. Flemming, 178 F. Supp. 791 (N.D.W.Va., 1959), at pages 792, 793:

"* * * Analysis of the cases involving the term shows that 'substantial' evidence is more than a scintilla, but less than a preponderance. The leading definition of substantial evidence is 'enough [evidence] to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' National Labor Relations Board v. Columbian Enameling and Stamping Co., 1938, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660. Carrying this definition a step further necessitates determining a standard for submission of factual questions to a jury. Here, the ground is more familiar. A recent guide is found in the statement, 'if more than one reasonable inference can be drawn from the evidence, the case should be submitted to the jury.' Town of Ninety Six v. Southern Ry. Co., 4 Cir., 1959, 267 F.2d 579, 582. Cf. Tennant v. Peoria and Pekin Union Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. The Fourth Circuit, on review of the submission of factual questions to a jury, said *Our inquiry is not whether there was evidence to support a result contrary to the jury's verdict, but whether there was evidence legally sufficient to support the verdict that was found.' * * * This Court is limited in its review to determining whether there is substantial evidence to support the finding of the Appeals Council,* and may not extend review to whether another conclusion is possible—or even

more logical—under the record as adduced during the administrative process." (Emphasis supplied.)

See also Martin v. Ribicoff, (D.C.Mont. 1961) 196 F.Supp. 547; Randall v. Flemming, 192 F.Supp. 111 (W.D.Mich., 1961).

█ The question of what amounts to substantial evidence is a matter of law and, therefore, this court must review the entire record to determine as a matter of law whether there is substantial evidence to support the defendant's findings and decision denying the plaintiff's application for disability insurance benefits. Randall v. Flemming, supra.

█ The burden of proving a condition of disability is upon the claimant under the statute—both in the administrative proceeding and in any proceeding in this court. Randall v. Flemming, supra.

█ The findings of the hearing examiner, while persuasive, are not binding on this court, and must in fact be supported by substantial evidence. Randall v. Flemming, supra.

The hearing examiner, whose findings were ultimately adopted by the Secretary as final, made two pertinent findings of fact which must be supported by substantial evidence. First, the examiner found that the claimant was not suffering from a *physical disability*. With this finding there can be no quarrel after a reading of the medical evidence.

Secondly, the examiner found that claimant was not suffering from a mental disease of such a nature as to constitute a disability under the Social Security Act. This finding requires a closer look to determine whether there is substantial evidence to support it.[1]

The preliminary facts can be briefly stated. Claimant filed application to establish disability on May 20, 1957, and filed application for disability insurance benefits on February 3, 1958. The claim was ultimately denied on September 20, 1960.

On December 28, 1960, claimant filed application for period of disability and disability insurance benefits, which claim was denied July 27, 1961. It is the rul-

---

1. The Social Security Administration Regulations No. 4, Section 404.1519(c) on mental disorders states:

"(2) Functional mental disorders (psychoses, psychoneuroses, personality disorders). The mere presence of psychotic or psychoneurotic symptoms and signs is not necessarily incompatible with the inability to perform substantial gainful work. Consideration is given as to whether evidence shows regression or deterioration of the individual's intellectual, behavioral or emotional reactions and whether the defects so impair the effectiveness and predictability of the individual's behavior so as to be incompatible with occupational activity. Some of these disorders frequently respond adequately to treatment. Spontaneous remissions may also occur.

"(i) Psychoses. In psychoses, the symptoms reflect a break with reality and hospitalization may be necessary. Actual symptoms and persistence of the condition, length of any hospitalization and response to therapy are considered in determining the effect of these disorders.

"(ii) Psychoneuroses. In determining the effect of psychoneuroses, con-

sideration is given to whether the psychoneuroses has resulted in severe social, personal and occupational regression or confinement to a mental hospital and whether it persists despite appropriate treatment. The manifestations of tension, anxiety, depression or psychophysiological disturbances, behavioral disturbances, hysterical reactions or obsessive compulsive patterns should be carefully described. An adequate psychiatric examination is generally necessary.

"(iii) Personality disorders. Personality disorders are characterized by patterns of socially unacceptable behavior, such as chronic alcoholism, sexual deviation and drug addiction. In the absence of an associated severe psychoneurosis or psychosis, a personality disorder does not in itself result in inability to engage in substantial gainful activity. A person confined in a correctional institution because of antisocial behavior will not be considered disabled unless he has other severe impairments which would preclude any substantial gainful activity if he had not been so confined."

ing on this application which has ultimately found its way to this court.

It is the contention of claimant that since November 29, 1955 he has been unable to engage in any substantial gainful activity by reason of insomnia, headache, weakness, chest pain, stomach trouble, and sarcoma [2] caused by irritation of an ankle injury.

On July 15, 1954, claimant bumped his left ankle against some wooden boxes having metal hooks, and ripped the skin a little. That night the leg started swelling, and the next morning he reported to the first aid office. Dr. Robert Risk at first prescribed ice for the swelling.

Claimant worked very little after that. He was told by Dr. Risk that he was "nuts" and to forget about it. Claimant became "mad" and told Dr. Risk he wanted to see another doctor. Dr. Risk referred the claimant to Dr. F. James Stubbart.

Dr. Stubbart had a biopsy performed on the ankle and reported to the claimant that it was cancer. Beginning on October 22, 1955, and ending November 29, 1955, Dr. Stubbart treated the area with X-ray, a total of eight treatments. Claimant stated that his ankle was burned by these treatments.

Claimant began receiving workmen's compensation benefits November 30, 1955.

Claimant stated that Dr. Stubbart eventually informed him that the condition was not cancer, and that he had been mistaken in the biopsy. Claimant felt that this was part of a conspiracy to deprive him of compensation, and only went to see Dr. Stubbart once or twice thereafter.

The medical report filed by Dr. Stubbart in this matter, undated, but filed May 27, 1957, stated only: "Psychoneurosis."

Dr. Stubbart referred claimant to Dr. Bussard, M.D., who reported seeing him January 30, 1956, and February 9, 1956. It appears this was only for examination. Dr. Bussard's report, dated October 4, 1957, shows:

"Severe psychoneurosis. I have no notion of what basis this patient is requesting permanent disability. He was seen on only two occasions, 1/30/56 and 2/9/56."

Claimant made occasional visits to his family doctor, Dr. Ephraim P. Boldyreff. After examination but no treatment, Dr. Boldyreff's report, dated June 28, 1957, states:

"Severe psychoneurosis. * * * At present * * * improved but needs assurance to overcome worries and regain confidence."

Claimant was a patient in Hackley Hospital from March 8, 1954 to March 15, 1954, when a hernia operation was performed. He was again a patient in Hackley Hospital from March 29, 1956 to March 30, 1956, for a recurrent hernia. A letter from the record librarian to the Social Security District Office in Muskegon, dated June 4, 1958, states:

"Provisional diagnosis: Left indirect recurrent hernia, psychoneurosis severity undetermined. * * He had a small sarcoma of the ankle treated and removed by Dr. Stubbart. * * * Since then he has had a cancer phobia. He was urged to come in and get the hernia repaired. It was obvious, however, that the man was so shaken and stated that he was afraid we were going to find him full of cancer, when we repaired his hernia, * *. He was seen in consultation, and it was promptly decided that he was not a man to operate because he was a poor surgical risk, because of his extreme fear and apprehension, and a possibility of developing a traumatic neurosis. Patient was discharged without surgery.

2. "Sarcoma. A tumor made up of a substance like the embryonic connective tissue; tissue composed of closely packed cells imbedded in a fibrillar or homogeneous substance. Sarcomas are often highly malignant. * * * " Dorland's Medical Dictionary, 23rd Edition.

"Final diagnosis: * * * psychoneurosis, severe, anxiety type."

Claimant was a patient in Riley Sanitarium from July 15, 1956 to July 20, 1956. He received extensive examination but no report was made concerning any mental condition.

Workmen's compensation benefits were terminated April 2, 1956, and subsequently restored by the Appeal Board December 19, 1957. In connection with these proceedings, claimant was examined by Dr. Henry DeLeeuw, Dr. David Davis, psychiatrist, and Dr. A. F. Dasler, Neuropsychiatrist.

The reports of these examiners, as contained in the orders of the Workmen's Compensation Board, and as set out in the hearing examiner's decision now under review, were as follows:

Dr. Henry DeLeeuw report of August 27, 1956 referred to claimant's ankle and stated: "the diagnosis is not Kaposi's (sic) Sarcoma, but Stasis Dermatitis."

Dr. David B. Davis, psychiatrist, reported on June 14, 1956, as follows:

"This man is mentally ill and has been for a long time. He entertained ideas of persecution long before he had his injury and, following the rather minor injury, he began to take the attitude that no one appreciated him, that he was being persecuted and he became suspicious that they were not telling him the truth. He has felt that there was a definite plot against him and his outbursts that he has had concerning this part of the illness are in no way different from the outbursts he has had off and on for years. This man is in need of intensive psychiatric care and is suitable for psychiatric hospital care."

The hearing examiner then continued to summarize Dr. Davis' report:

"Reporting on his examination of April 5, 1957, Dr. Davis concluded with the observation that claimant continued to have a somatic delusion concerning cancer and apparently no amount of explanation during the past year had done anything to change this delusion. He also had ideas of persecution directed against members of the working force in the plant, the plant doctor, his own attorney and the attorney for the insurance company. Claimant was certain that there was a plot afoot to deprive him of his compensation and at the same time to conceal from him the truth concerning his having cancer. Dr. Davis believed that claimant was mentally ill from a paranoid state and was certain that he was in need of psychiatric care. If claimant would cooperate, it might be possible to treat him in a psychiatrist's office; but this would not be as easy as treating him in a psychiatric institution. He stated that it would be impossible to tell how long such treatment would take but noted that it was well known that patients with a paranoid state were ill for many months to years and that claimant had already been ill since June, 1954." Examiner's decision, Transcript, page 20.

Dr. A. F. Dasler, Neuropsychiatrist, has his report of September 20, 1957, summarized by the hearing examiner as follows:

"Claimant was worried about his leg and these worries became well founded when a cancer was discovered at the scar site. His worries were further increased in this state when he required 8 instead of 6 X-ray treatments. 'By now he was in a bad state and he then lost 13 pounds.' It was believed 'that the accident triggered the neurosis, his preoccupation and cancer added insult to injury and the time element involved added to prolonging his neurosis.' The doctor stated that he seriously questioned a healthy motivation to return to work. 'These physical diagnoses may keep him a cripple. There is even a question whether claimant might again be pre- or actually psychotic.'

"The record shows that the hearing examiner deemed a neuropsychiatric consultative examination advisable but that the claimant failed to cooperate or submit thereto. He insisted that there was nothing wrong with him mentally and that such examination was totally unnecessary." Examiner's decision, Transcript, page 20.

The last comment above made is a statement made by the hearing examiner for the Social Security Office bearing on the report of the neuropsychiatrist.

On March 21, 1958, claimant was examined by Dr. Wendell H. Rooks, M.D., at the government's expense. His letter dated April 11, 1958, reported:

"Impression: Character disorder, paranoid, qualities with anxiety symptoms. An employer would have to be very permissive or very hard up for workers to keep patient while in his present state of mind."

Claimant was also examined on August 4, 1959 by Dr. William M. LeFevre, M.D., at the government's expense. His letter dated August 4, 1959, stated:

"This man is thoroughly convinced that he had cancer and that all the doctors he has seen, all the hospitals he has been in and Mr. Marcus, the CIO lawyer who handled his case originally, are all against him, and all double crossing him and trying to prevent him from getting his just reward. * * * This should be investigated. In my opinion, he is a perfectly sound, healthy individual capable of a full days work."

The only additional documentary evidence submitted concerning this claimant's condition was supplied by Dr. Johannes D. Plekker on May 22, 1961. At the request of the government, claimant underwent a neuropsychiatric consultative examination, and the result may be taken from the report filed by Dr. Plekker:

"He was sent to several psychiatrists who he said claimed that he was paranoid and crazy. He described the psychiatrists as 'lunkheads' and also 'alcoholics' and 'fellows who call themselves a doctor.' He said that he was not crazy but that they were trying to deprive him of his proper compensation. He said that he was told to join the Communist Party to get Social Security. He was surprised that the U.S. Government used Communistic deals against ordinary citizens like himself who had paid into Social Security all of his working life. He brought the issue to the court and said he took it as far as the Supreme Court of Michigan and received $32.00 a week compensation around December 1957. He said he had to fight them for twenty months. At the same time they took away his pension and hospital insurance benefits. He said he did not need a psychiatrist but the social security people did and that the benefit you got depended on who you knew but not as to what was wrong. He felt also that the psychiatrists were all filthy liars.

"At present he has a lump in his left groin which is probably the left inguinal recurrent hernia described in a report from Hackley Hospital dated June 4, 1958. Prior to his second admission in March 1956 to this hospital, he had threatened to go out West to get an independent doctor to examine him and he also threatened to get a lawyer. The company people then came to his house and arranged hospital care and surgery and said he would not sign a paper to put a knife in him to kill him. They told him that it was a rupture but he did not believe it. He said that he knew a rupture when he saw one.

"At the present time he believes that this lump in his left groin is cancer which spread from his ankle injury. His left leg had been sore and he said his veins have puffed up. This cancer is now spread

throughout his whole body so that he had scabs on his scalp, his tongue has turned white, he suffers from insomnia, he feels very tired, has trouble with his stomach, feels a growling in his abdomen while he sits in church, has constipation and gas. He is not sure whether the scabs on his head are due to the cancer or to x-ray poisoning.

"While he was employed he was a steward in the shop and he fought for the rights of his men against the company, he said that he felt the company was ready to kill him at any time if there had not been a law to prevent it. At the present time he would be happy to return to work but the doctors have told him to take it easy, but the patient is also exceedingly worried about his health and feels that whenever he leaves home for any distance that he might never return. He believes that the social security people understand this because instead of sending him to Ann Arbor this time they sent him to a psychiatrist in Grand Rapids.

"The wife contributed very little to the history but she seemed to believe everything the patient said. On the basis of the definite delusions he has I would diagnose his case as a paranoid state with delusions of persecution and delusions of his body rotting away due to a generalized cancer or x-ray poisoning. These symptoms are quite severe and the delusions are well fixed. These delusions were evidently also present in 1955 when he refused a second operation for hernia. He has interpreted subsequent events in the light of his original delusion so that they have become more severe but not different in quality during the last six years. From the history he gives me I gain the impression that he has been refused work in the past six years on the basis of his mental aberration. He interprets this however in terms of being per-

secuted by the company and in their presumed attempt to deprive him of all benefits which he has determined to have. He claimed that if he did not now get social security benefits that again he would go to court about it."

After summarizing this rather overwhelming medical evidence at the close of his decision, the hearing examiner concluded his finding as to claimant's mental condition with this statement (Transcript, page 23):

"There may be a question as to the proper mental diagnosis which is applicable in this case, and it may be questionable whether his 'delusions' or phobia on the subject of cancer is a product of unconscious conflicts being expressed in a distorted fashion or a 'compensation' type of problem with rationalization on a conscious basis to support his demand for benefits. His paranoid pathology appears to be entirely circumscribed in this area, and he otherwise appears to function adequately in his community, not requiring institutionalization or supervision."

This is but the long way of saying that claimant is faking his illness for compensation purposes. It is clear, however, that not one of the examining doctors made this finding. One non-psychiatrist, Dr. LeFevre, stated that this man was capable of a full day's work. Although this was a possibility to be met, not one of the psychiatrists stated that his mental illness was "compensation" oriented.

Two members of the Workmen's Compensation Appeal Board dealt with this same problem. They stated in their opinion (Transcript, page 137):

"He is truly disabled or he is a faker. If he is truly disabled then his disability has been adjudicated to be due to a psychosis. If he is a faker then perhaps this Board referred the wrong person for psychiatric care. Chancing again my own referral I state that I do not believe

the evidence before us will support a finding that plaintiff is a faker. I am convinced that he is truly disabled and that his disability is due to a mental derangement resulting from the injury he received. His reactions as shown by the record before us are typical of the psychotic."

Similarly, there is no evidence, and certainly not substantial evidence, to support a finding in this case that claimant is faking his illness.

The hearing examiner has referred to Section 404.1502(g) of Regulations No. 4. That section provides:

"An individual will be deemed not under a disability if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity."

From the evidence presented in this case, the refusal of the claimant to accept rehabilitation is consistent with the finding of true disablement due to mental illness. The Appeal Board for the state workmen's compensation board stated in this regard, when the same problem arose in connection with state benefits:

"Will the stopping of compensation force this psychotic to accept something that he in his mental state seriously thinks he does not need? I do not believe that it would. This fact has already been demonstrated to some extent for compensation payments were stopped on May 26, 1958. Plaintiff has not received any weekly payments since that time yet this Board could not succeed in getting this person to come before us on two occasions when we scheduled hearings on review. * * * This employee truly needs help, not coercion.

"Are such reactions as those demonstrated by plaintiff truly conscious refusals to cooperate in his rehabilitation? I cannot conclude that they are. His present mental state is such that he cannot be held responsible for his refusal to accept care recommended by this Board. * * Stopping weekly compensation benefits could easily be the final straw that would plunge this employee into a chasm of no return and send him to a hospital with an incurable condition."

 The same reasoning applies to the application in this case. What this claimant needs, according to the evidence, is help, not coercion. There is no evidence to support a finding that he is not truly disabled due to mental illness, within the provisions of the Social Security Act, 42 U.S.C.A. § 423(c) (2); Regulation No. 4, § 404.1519(c).

The Court concludes that the decision of the hearing examiner is based upon insubstantial evidence. His opinion, therefore, is reversed with instructions to allow disability benefits to the claimant.