Wanah R. MC GAHA, Plaintiff,

v.

Abraham RIBICOFF, Secretary of Health, Education, and Welfare, Defendant.

Civ. A. No. 2707.

United States District Court
D. Delaware.

Dec. 15, 1966.

**162**

John A. Rich, Wilmington, Del., for
plaintiff.

Alexander Greenfeld, U. S. Atty., L.
Vincent Ramunno, Asst. U. S. Atty., Wil-
mington, Del., Robert Heideman, Assist-
ant Regional Counsel, Department of
Health, Education, and Welfare, New
York City, for defendant.

## OPINION

STEEL, District Judge.

This is an action under § 205(g) of the Social Security Act, 42 U.S.C. § 405 (g), to review a final decision of the defendant, Secretary of Health, Education and Welfare, holding that the plaintiff is not entitled to the establishment of a period of disability under § 216(i), 42 U.S.C. § 416(i), or to disability insurance benefits under § 223(a), 42 U.S.C. § 423(a), on the basis of his application of May 24, 1961. The decision of the Hearing Examiner was rendered on March 15, 1963. This became a final decision of the defendant on May 21, 1963 when the Appeals Council refused to review the decision. This action followed.

In accordance with the requirement of § 205(g), the Secretary filed, as part of his answer to the Complaint, a certified copy of the transcript of the record, including the evidence upon which the findings and decisions complained of were based. Thereupon defendant moved for summary judgment. It is that motion which is before the Court.

For plaintiff to have been eligible for monthly insurance benefits he must have been under a continuous disability, as defined in the Act, beginning not later than March 31, 1956, when he last met the special earnings requirement, and continuing to and at the time of, the filing of his application on May 24, 1961. Section 223(c), 42 U.S.C. § 423(c).

"Disability" is defined by § 223(c)(2), as amended by § 303(a)(2) of the Social Security Amendments of 1965, P. L. 89–97, 79 Stat. 286, as follows:

"[T]he term 'disability' means (A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for

a continuous period of not less than 12 months * * *." [1]

The Examiner held that plaintiff was not entitled to disability insurance benefits or to a period of disability under §§ 223(a) and 216(i) of the Social Security Act, as amended, because plaintiff failed to establish that on March 31, 1956, he " * * * had impairments either singularly or in combination of such severity as to prevent him from engaging in any substantial gainful activity * *."

Having concluded that the plaintiff was not disabled on March 31, 1956, it was unnecessary for the Examiner to make a finding whether plaintiff was disabled continuously thereafter until May 24, 1961, and he did not do so. Nevertheless, the fair inference from the Examiner's decision is that plaintiff was not disabled between those dates in view of the amount of his earnings and duration of his employment during that time.

Plaintiff had the burden in the administrative proceedings of establishing his right to disability insurance benefits. Randall v. Flemming, 192 F.Supp. 111, 115 (W.D.Mich.1961). Implicit in the decisions of the Examiner and the Appeals Council is a determination that plaintiff failed to sustain this burden.

In this review proceeding, findings of the defendant as to any fact, if supported by substantial evidence, are conclusive. Section 205(g), 42 U.S.C. § 405(g). This principle has application, not only to primary evidentiary facts, but also to any inferences drawn from such facts. Barnes v. Celebrezze, 224 F. Supp. 269, 272 (E.D.La.1963). The principle, however, necessarily presupposes that the findings are the result of the application of proper legal standards to the evidentiary facts. Section 10 of the Administrative Procedure Act, 5 U. S.C. § 1009(e).

The question of what amounts to substantial evidence is a matter of law, and the Court is required to review the entire record to determine as a matter of law whether there is substantial evidence to support the defendant's finding that plaintiff was not disabled at the critical time. Randall v. Flemming, supra, 192 F.Supp. at 115; Sangster v. Celebrezze, 226 F.Supp. 1, 3 (W.D.Mich. 1964).

After a review of the entire record, the Court is satisfied that the finding of the Examiner and Appeals Council that plaintiff was not disabled on March 31, 1956, and inferentially thereafter until May 24, 1961, is not supported by substantial evidence.

A finding of disability cannot be based upon sporadic employment. Only if one is able to perform substantial gainful services with reasonable regularity can he be deemed to be able to engage in substantial gainful activity. This principle was seemingly ignored by the Examiner in evaluating the evidence, despite the fact that the principle is reflected in Congressional history of the Act and in precedents thereunder.

In explaining the concept of "substantial gainful activity" in hearings on H. R. 7225 (the Social Security Amendments of 1956), the defendant submitted a statement to the Senate Committee on Finance, 84th Cong., 2d Sess., which read (p. 43):

"Substantial gainful activity means the performance of substantial services with reasonable regularity * * complete helplessness is not necessary to a finding of an allowable disability. Sporadic or infrequent activity would

---

1. This definition, by § 303(f) (1) (B) (ii) of the Social Security Amendments of 1965, is applicable in the instant case.

Both the decision of the Hearing Examiner and that of the Appeals Council were rendered prior to the enactment of the Social Security Amendments of 1965. At the time of their decisions "disability"

was defined by § 223(c) (2), 42 U.S.C. § 423(c) (2):

"[T]he term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration".

not necessarily establish ability to engage in substantial gainful activity." [2]

In Campbell v. Flemming, 192 F.Supp. 62 (W.D.Ky.1961), the Court said at p. 63:

"Substantial gainful activity means the performance of substantial services with reasonable regularity in some competitive employment or self-employment. It does not contemplate complete helplessness, and a sporadic or infrequent activity does not establish the ability to engage in the required gainful activity."

■■ The rule is clearly established that the fact that claimant may have had some income from intermittent or sporadic employment does not necessarily bar from establishing disability under the Act. Randall v. Flemming, supra, 192 F.Supp. at 127. The phrases " 'inability to perform any substantial gainful activity' " and "total disability" are not synonymous. Foster v. Ribicoff, 206 F. Supp. 99, 101 (W.D.S.C.1962).

The definition of disability under the Social Security Act is substantially the same as it was under the old War Risk Claims Act from which a substantial body of authoritative precedent has been established. Corn v. Flemming, 184 F. Supp. 490, 493 (S.D.Fla.1960); Lease v. Flemming, 178 F.Supp. 169, 172 (D.Md. 1959). In Ross v. United States, 49 F.2d 541 (5th Cir. 1931) which arose under that Act, the Court said at p. 542: "To be able 'to follow any substantial gainful occupation,' within the practical common-sense meaning of the phrase, implies ability to work at it all the time." In United States v. Sanford, 73 F.2d 233 (5th Cir. 1934), the Court said at p. 234:

"[W]e have also held that employment for limited periods does not defeat recovery, if it is reasonably certain that disability beginning while the policy was in force would prevent the insured from continuously following a substantial gainful occupation."

Both the Ross and Sanford cases are cited in Corn v. Flemming, supra, 184 F.Supp. at 493–494, as laying down proper standards to apply in determining whether a claimant is disabled under the Social Security Act.

■ Does the record reflect an ability on plaintiff's part to work regularly on March 31, 1956? First, consider the evidence of plaintiff's condition and employment status prior to that date:

On September 23, 1951, when plaintiff was working at General Motors, he was stricken with chest pains and was taken to the Kent County Hospital in Dover. His past history, as reported by him, revealed a heart condition. His trouble was finally diagnosed as chronic cholecystitis,[3] and he was discharged on September 28, 1951. Following this hospitalization plaintiff stayed home in bed about six to ten weeks. He was under medical care part of the time and nitroglycerine pills [4] were being administered to him when he had chest pains. These pains continued for a year and a half or two years "right constantly" after which they wore away. Then plaintiff began having trouble with his legs. When he walked they hurt up the back, and his left foot got numb and cramped. On July 13, 1955, plaintiff consulted Dr. Berlin about a pain in his right leg of eight months duration. He said that it was aggravated by walking and relieved by standing. Dr. Berlin found claudication [5] in the right calf but no clinical

2. This statement is referred to with approval in Adams v. Flemming, 173 F. Supp. 873, 879 (D.Vt.1959), rev'd on other grounds, Adams v. Flemming, 276 F. 2d 901 (2d Cir. 1960).

3. Inflammation of the gall bladder. Schmidt's Attorneys' Dictionary on Medicine, 166.

4. This is utilized chiefly to prevent or relieve attacks of angina pectoris. Schmidt's, supra, at 551.

5. Cramp-like pains in the legs. Schmidt's, supra, at 175.

evidence of ischemia.[6] His impression was that plaintiff was suffering from peripheral vascular disease, and recommended medication, abstinence from tobacco and "rest." Concerning his visit to Dr. Berlin plaintiff said:

> "I was bothered with my legs a long time. See I was the guy who would never go to a doctor. I was stubborn I guess. I just would suffer rather than go to a doctor. When I finally did go they got so bad I finally did go to him. I got so I couldn't hardly walk at all."

So far as appears, plaintiff's consultation with Dr. Berlin was the last contact he had with any doctor or hospital prior to March 31, 1956. From the time when plaintiff was discharged from the Kent County Hospital on September 28, 1951, until the last quarter of 1957 when plaintiff went to work for Union Park Motors, (of which more hereafter) he did no work of any kind except during something less than three months in 1953 when he earned $224 working as a night watchman for a contractor.

In view of plaintiff's history of heart trouble, the difficulty he was having with his legs, the medical evidence of claudication in his right calf, and Dr. Berlin's recommendation that plaintiff rest, there does not appear to be substantial evidence prior to March 31, 1956, that plaintiff was able to work with any regularity on or prior to that date. Certainly there is no medical evidence to substantiate the finding. Nor is plaintiff's employment of less than three months during a span of five and one-half years adequate to do so.

Only if the record disclosed that plaintiff was a malingerer might there be justification for concluding upon the basis of the evidence prior to March 31, 1956, that plaintiff was physically able to work on that date. No such finding was made or is justified. The fact that plaintiff took a job after he filed his application for disability insurance, and

indeed was working up until the very time when he entered the Wilmington General Hospital in February, 1962 to have his legs amputated, is convincing proof that plaintiff was not a malingerer and wanted to work if he was able to do so.

The Examiner's finding that plaintiff was not disabled on March 31, 1956, is seemingly attributable to plaintiff's work activities between that date and May 24, 1961, when his application for disability insurance was filed. It is clear, however, that plaintiff worked with no regularity even during that period. Between the last quarter of 1957 and the first quarter of 1959 plaintiff was employed as a mechanic by Union Park Motors and earned $5,015.02. Then followed about a year's employment in the same capacity with Stokes Garage. For this plaintiff received $3500. Thereafter, plaintiff was out of work for about a year and a half. In November of 1961 he began working for Moore Heat Appliance Co. where he continued to be employed until February of 1962. He then entered the Wilmington General Hospital and had both of his legs amputated. Hence, during the five year period between March 31, 1956 and May 24, 1961, plaintiff was employed only about half of the time.

Furthermore, during the time when plaintiff was employed, his work was sporadic because of the constant difficulty he was having with his feet and legs. At Union Park Motors he experienced severe cramps in his legs and had to stop and rest and catch his breath frequently. Because of excessive absence due to his condition, he was finally laid off.

While he was working at Stokes Garage, he went to a chiropodist every week for five or six months to have his feet massaged and put on a vibrator because of the numbness he was encountering. He lost much time from work. While some of his absence was due to business being slow, most of it was the result of

---

**6.** A condition in which a part of the body suffers from a lack of blood, usually because of a contraction of the blood vessels. Schmidt's, supra, at 415.

his inability to work. Plaintiff said that his condition became much worse while working for Stokes. He was finally laid off due to loss of time.

It was the same story at Moore Heat Appliance Co. Plaintiff's legs frequently got tired and he had to sit down and rest. Because he was a friend of the owner of the business he was accorded special privileges.

That plaintiff continued to have constant difficulty with his legs and seemingly related heart involvement after March 31, 1956, is supported medically.

On March 24, 1958, plaintiff saw Dr. Berlin and, as he had previously done on July 13, 1955, plaintiff again complained of pain in his right leg which was aggravated by walking and relieved by standing. Dr. Berlin diagnosed the difficulty as a mild degree of ischemia.

On September 1, 1960, plaintiff saw Dr. Berlin. The latter's report shows that plaintiff complained of the same symptoms as he did on July 13, 1955, namely pain in his right leg which was aggravated by walking and relieved by standing. In 1960 plaintiff complained that his pains were more severe and were in both legs. Dr. Berlin was under the impression that plaintiff was suffering from chronic occlusive arterial diseases.[7]

On October 29, 1960, plaintiff was admitted to the Wilmington General Hospital complaining of coronary-type chest pains. An electrocardiogram on admission revealed recent antero-septal myocardial infarction.[8] Plaintiff was discharged on November 25, 1960, but anticoagulant therapy was continued for about six months.

On June 29, 1961, he again went to the Wilmington General Hospital complaining of coronary-type chest pains. The hospital report indicates that plaintiff was being treated with nitroglycerine and peritrate, that the last electrocardiogram, taken on June 27, 1961, was within normal limits, that plaintiff's general condition was good, and a physical examination showed no detectable pathological findings. No reference was made in the report to any leg difficulty which plaintiff was experiencing. The report concluded:

"He is not eligible to do hard work which can cause anginal attacks. He is able to do light work."[9]

Between July 31, 1961, and August 19, 1961, plaintiff was in the Wilmington General Hospital as a result of an active duodenal ulcer.

On December 21, 1961, plaintiff again went to the Wilmington General Hospital complaining of a cramp-like sensation over the posterior aspect of both thighs and legs which was at the time accompanied by pain and coldness of both legs.[10] Operative procedures described as aortagram-bilateral femoral arteriograms were said to confirm the diagnosis of peripheral arteriosclerotic insufficiency. Plaintiff was discharged on December 23, 1961.

On January 14, 1962, he again entered the Wilmington General Hospital where, four days later, his left leg was amputated. His right leg was amputated shortly thereafter. Both the pre-operative and post-operative diagnosis indicated that plaintiff was suffering from peripheral arteriosclerotic—insufficiency-auto-iliac arteriosclerosis.

At the time when plaintiff's application for disability insurance was filed, he was 49 years old. He was married

---

7. Occasioned by the closing, shutting or blocking of a blood vessel by a blood clot. Schmidt's, supra, at 561.

8. An infarction is the process which leads to the formation of an infarct; i.e., the formation of a blood clot, the resulting obstruction to the circulation, the swelling, the death of tissue, etc. Schmidt's, supra, at 396.

9. In United States v. Sanford, supra, 73 F.2d at 234, the Court refused to set aside a verdict for plaintiff based upon a disability claim under the War Risk Claims Act despite the opinion of one doctor that "light employment would be beneficial."

10. Other complaints are shown on the summary sheet of the Wilmington General Hospital but are illegible.

and was living with his wife and ten year old daughter in a rented house. He had gone to the seventh grade in school and had taken correspondence courses in auto repairing. His employment experience appears to have been limited to doing work as an automobile mechanic and driving a truck, except for the three months when he worked as a night watchman.

The record in its entirety is sufficient to support a finding that the work plaintiff performed which the Examiner relied upon to refute his disability claim was carried on under the compulsion of economic necessity.[11] Compare Mabry v. Travelers Ins. Co., 193 F.2d 497, 498 (5th Cir. 1952) where the Court held it was error to peremptorily charge the jury that a claimant under the Texas Workmen's Compensation Act was not totally and permanently disabled. The Court stated that a vital issue which should have gone to the jury was whether the work performed by claimant was due to the necessity of physically supporting herself, even though she was not physically able to work. The Court said at p. 498:

> " * * * Pinched by poverty, beset by adversity, driven by necessity, one may work to keep the wolf away from the door though not physically able to work; and, under the law in this case, the fact that the woman worked to earn her living did not prevent a jury from finding, from the evidence before it, that she was totally and permanently disabled even while working."

■ Only one further question requires discussion; i. e., whether plaintiff's inability to engage in any substantial gainful activity was the result of a medically determinable physical impairment which had lasted for a continuous period of not less than 12 months prior to the filing of his application for disability insurance on May 24, 1961. The question, as stated, was not discussed by the Examiner. The reasonable conclusion to be deduced from the evidence is an affirmative one. As early as July 3, 1955, Dr. Berlin was under the impression that the pain which plaintiff was experiencing in his right leg was due to peripheral vascular disease. On March 24, 1958, he found that plaintiff's pain in his right leg was due to a moderate degree of ischemia. In January of 1962, plaintiff was suffering from severe peripheral arterial insufficiency, generalized arteriosclerosis and an old myocardial infarction, and as a result, both legs were amputated at the thigh. Thus, it appears that the peripheral vascular disease which existed on July 13, 1955, had by March 24, 1958 developed into a moderate degree of ischemia, and culminated in the severe peripheral arterial insufficiency which led to the amputation in 1962.

The evidence, therefore, overwhelmingly supports the conclusion that plaintiff was unable to engage in any substantial gainful activity by reason of a medically determinable physical impairment which lasted not less than twelve months prior to March 31, 1956, and continued to the date when his application for disability insurance was filed.

Defendant's motion for summary judgment will be denied, and the decisions of the Examiner and Appeals Council will be reversed with directions to accord plaintiff the disability benefits which he is entitled to by law.

---

11. The possibility that this may have been so was not considered by the Examiner. The failure of plaintiff to expressly assert before the Examiner that his work was due to the need of securing income to keep his wife and child may explain why the Examiner failed to deal with the point. It is to be noted, however, that in plaintiff's request for a review of the Hearing Examiner's decision, he said expressly:
"I was unable to work but did so because of financial needs to support my family."
The Appeals Council did not deal with the point.