### THEBERGE v. UNITED STATES.
### No. 42.

Circuit Court of Appeals, Second Circuit.
Feb. 1, 1937.

698

Joseph H. San, of New York City, Joseph A. McNamara, U. S. Atty., of Burlington, Vt., Julius C. Martin, Wilbur C. Pickett, and Randolph C. Shaw, Sp. Assts. to Atty., Gen., and William J. Hession, of Boston, Mass., for appellant.

Frank E. Barber, of Brattleboro, Vt., for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

■ This appeal presents as its single ground that the plaintiff did not make out a case for submission to the jury; the issue being whether the insured, who was dead upon the second trial, had been permanently and totally disabled, when he was mustered out of the service. He had enlisted first on July 22, 1917, and had been gassed on July 7, 1918, and wounded on October 4, 1918, both times in action. He was in a hospital for three months and was mustered out in June, 1919, and at once reënlisted. He contracted syphilis on October 3, 1919, but continued to serve until he was a second time mustered out on August 26, 1920, in this country. He came back to his home in Bennington, Vermont, where he at once took up his former occupation as a woollen weaver. He first went to the mill where he had last been employed and where, as appears from its records, he worked from October 2, 1920, to March 19, 1921, during which time he earned $757; at the rate therefore of about $30 a week. It is true that he did not work every day, but obviously he was not at that time unable "to follow continuously any substantially gainful occupation,"

even though he may already have been beginning to feel some effects from his infection. He was described as a "good weaver," and whatever his incipient disorder, it had not yet incapacitated him. It does not appear that he was discharged, nor indeed why he left at all; but whatever the reason, he went directly to Utica where he got a similar job in a mill of the American Woollen Company, and where, as again appeared from its records, he stayed until the end of January, 1922. His total wages for this period were $840; an average of about $25 a week. Again, he swore that he was in an excitable and nervous condition, which no doubt was true; but he was able to hold his job, his absences not being sufficient to cause his discharge. Once more it does not appear why he left Utica, whence he went directly to a mill in Rochester, New York, where he worked for five or six months until it closed down, after which he got another job at Philadelphia for five months more. It thus appears that for more than two years after the lapse of the policy, he was able to continue in the occupation in which he had been skilled before his enlistment, and substantially without intermission. It is not necessary to trace his doings thereafter and until he filed his complaint in November, 1931. By that time his disease had progressed until he was mentally deranged—at least a jury might find so. His death confirms the obvious conclusion that he had succumbed because of the infection. In the face of this record it was error to submit the case to a jury.

■ The plaintiff's excuse is that the insured was not obliged to continue work at the risk of his health. United States v. Acker, 35 F.(2d) 646, 648 (C.C.A.5); United States v. Lawson, 50 F.(2d) 646, 651 (C.C.A.9); Fladeland v. United States, 53 F.(2d) 17 (C.C.A.9). The doctrine is a humane one and not to be discouraged, but it must not be misused. A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities; if the insurance had been against suffering, it would have read so. The only work available to the insured must do more than hurt, it must substantially aggravate his malady. The evidence at bar does not measure up to that standard. Ross, the plaintiff's first medical witness, first said that work would make no difference to the insured; next that he could not work without impairing

his health; next that at such an early stage it would have little effect on his health, that it took five years or more for syphilis to "get into the nervous system"; and finally upon suggestive questioning by the judge that work would harm his nervous system "quite a bit." O'Brien the next medical witness, first said that the effect of work depended upon how far the disease had gone; next that he could not tell much about it, but that if the changes came early he would endanger his health and that in this case he could not say. Finally, upon a question from the judge the witness declared that the insured could not work without harm. Ripley, the third medical witness, first said that work would aggravate the malady, that it would make him more nervous; next that if he was well enough, it would not hurt him, though the witness (who had not seen him till shortly before the trial) thought he had not been, but that it would not be serious; finally in answer to a general question (which the judge amended), referring to a date not specified, that his health would be seriously impaired. The first two witnesses were so plainly vacillating that their opinions came to substantially nothing. More may be said for the third, but even as to him it is impossible to know what he would have said if he had not been unwarrantably led. The evidence was too uncertain to support a verdict based upon the doctrine that the insured was unemployable except at the risk of his health.

But quite aside from this, a verdict should have been directed for another reason. Syphilis is indeed not always a curable disease, but the evidence was all to the effect that if the well-known treatment is followed, it often is, and the insured although advised that he should undergo it, refused to do so. That was a bar to his recovery. Eggen v. United States, 58 F. (2d) 616, 620 (C.C.A.8); United States v. Clapp, 63 F.(2d) 793, 795 (C.C.A.2). The reason is apparent. He must show that at the lapse he is permanently disabled, and this must always remain uncertain when treatments were available to him which had reasonable hope of success. Lumbra v. United States, 290 U.S. 551, 560, 54 S. Ct. 272, 276, 78 L.Ed. 492. If the disease is one which is often curable, nobody can say that it would not have been cured. In United States v. Sanford, 73 F.(2d) 233 (C. C.A.5), the insured had taken the treatment.

Judgment reversed.