Vera SAYERS, Plaintiff-Appellant,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 16943.

United States Court of Appeals
Sixth Circuit.

July 14, 1967.

941

Ronald W. May, Pikeville, Ky., for appellant.

J. T. Frankenberger, Asst. U. S. Atty., Lexington, Ky. (George I. Cline, U. S. Atty., Lexington, Ky., on the brief), for appellee.

Before PECK and McCREE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal from a disallowance of an application for disability insurance benefits under the Social Security Act.

Appellant, Vera Sayers, is 49 years old. After finishing the 8th grade, she went to work. During her lifetime, her entire experience has been in the field of standing and sedentary labor. In her application for disability benefits, she stated that she became unable to work on June 26, 1963, because of a ruptured spinal disc. The Hearing Examiner denied her application on the ground that she was not under a disability and not entitled to the benefits. This decision was later affirmed.

■ Because of the repeated necessity of reversing the Secretary in these cases, we should go back to the origins of the statute and consider first things first. The Act was adopted pursuant to a public policy unknown to the common law, designed for the protection of society, and enacted to alleviate the burdens which rest on large numbers of the population because of the insecurities of modern life, particularly those accompanying old age, unemployment, and disability, through the establishment in advance of a provident fund for the needy worker, out of which he will be paid disability benefits, annuities, and compensation; and there is no question that the Social Security Act is constitutional.

"The short and simple annals of the poor," wrote Gray. That was in the day of grinding poverty and hunger, and poorhouses. One could hardly imagine that in a year or so, poorhouses would disappear from the land. In those days, the Social Security Act was enacted into law.

The Social Security Act brought with it, among other provisions, the right to disability benefits for workers who have become disabled from doing the work—usually the hard manual work—that they have done during their lives.

In McGaha v. Ribicoff, 262 F.Supp. 161, 167, the court, in a case involving disability benefits under the Social Security Act reversed the Hearing Examiner and stated:

"The record in its entirety is sufficient to support a finding that the work plaintiff performed which the Examiner relied upon to refute his disability claim was carried on under the compulsion of economic necessity. Compare Mabry v. Travelers Ins. Co., 193 F.2d 497, 498 (5th Cir. 1952) where the Court held it was error to peremptorily charge the jury that a claimant under the Texas Workmen's Compensation Act was not totally and permanently disabled. The Court stated that a vital issue which should have gone to the jury was whether the work performed by claimant was due to the necessity of physically supporting herself, even though she was not physically able to work. The Court said at p. 498:

" ' * * * Pinched by poverty, beset by adversity, driven by necessity, one may work to keep the wolf away from the door though not physically able to work; and, under the law in this case, the fact that the woman worked to earn her living did not prevent a jury from finding, from the evidence before it that she was totally and permanently disabled even while working.' "

In Massey v. Celebrezze, 6 Cir., 345 F.2d 146, 157, the court remarked:

"Some people have always blamed the poor for being poor, and the unemployed for being unemployed, as is especially remembered from the early days of the Works Progress Administration more than thirty years ago."

In Lightcap v. Celebrezze, D.C., 214 F.Supp. 209, 216, in considering a claim for disability benefits, the court said that, as adjured by the Supreme Court, "courts must now assume more responsibility for the reasonableness and fairness" of the decisions of federal agencies "than some courts have shown in the past" and "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function." Univer-

sal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456.

In these cases, where there have been such a great number of reversals, and where the same errors have been repeatedly pointed out, the records should be carefully examined and reviewed by the courts, and an opinion should generally be written, setting forth the facts and law, to show that the courts have, in reality, assumed more responsibility for the reasonableness and fairness of the decisions of federal agencies, than some courts have shown in the past; and that reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function, as we have been directed and cautioned by the Supreme Court in Universal Camera Corp. v. National Labor Relations Board, supra, for this case obviously means that courts should scrutinize the decisions of agencies, more than they have in the past, to ascertain whether they are reasonable and fair. The great number of errors and reversals, in the past, in these cases, constitute a warning signal.

In Miracle v. Celebrezze, 6 Cir., 351 F.2d 361, 382, the court emphasized these factors and said:

"The review of cases for disability benefits under the Social Security Act is onerous from many aspects. The case before the Hearing Examiner is heard informally. This means that there is practically no examination or cross-examination of any witnesses, except the claimant himself, usually a man whose life has been one of hard labor, and with little education; and, sometimes, a Vocational Counselor. The record, for the most part, consists of letters and written statements regarding the disability claimed, the extent of it, or the lack of it. Many of these statements consist of official printed forms of applications and reports filled in, in the handwriting of various individuals; and their reproduction in the record often requires laborious decipherment. These records call for searching investigation by the district courts, and further searching investigation by appellate courts."

In Scott v. Celebrezze, 241 F.Supp. 733, 736 (S.D.N.Y.), Judge Feinberg emphasized how searching must be the review by the courts of the action of the Secretary, and mentioned that in the cases reported in volumes 227–236 of Federal Supplement, the Secretary's decision was upheld only 27 times, but reversed or remanded 47 times; in Miracle v. Celebrezze, supra, it was said that in this court, during the past five years, the Secretary's decision was upheld 5 times and reversed 12 times, which again shows how careful and searching must be the review; and in Seldomridge v. Celebrezze, D.C., 238 F.Supp. 610, 620, the court said:

"The decisions of the Courts in this Circuit appear to be in accord with the numerous decisions in other Circuits. As an example, a compilation of the September-October-November 1964 Federal Supplement (Vol. 231–234), indicates that of the 28 cases reported, the Social Security Administration was reversed in at least seventy-five percent of the cases, and ninety percent of those reversals was for lack of substantial evidence to support the Secretary's findings, just as in the instant case I have found a lack of substantial evidence." (Footnote 17)

With regard to the appellant in this case, during the years she was employed, she has worked on a packing line, packaging small parts in cartons for overseas shipment; as a handpaster mounting small X-ray dental films; as an operator of automatic pasting machines; as a worker on a conveyor line in a packing department placing gaskets in boxes; and as an operator of an injection molding machine which molded plastic parts.

Appellant's testimony and evidence is as follows: She enjoyed relatively good health until 1940 when she fell on concrete steps. Inasmuch as she did not consider herself, at that time, to be severely injured, she did not seek medical attention. However, she later began to suffer pain, and on December 28, 1952,

was admitted to St. Mary's Hospital, Huntington, West Virginia, where a diagnosis revealed that she was suffering from a ruptured intervertebral disc L 4–5. On January 3, 1953, Dr. Francis A. Scott, an orthopedic surgeon of Huntington, West Virginia, performed a surgical operation on appellant, excised a protruding disc, and performed a spinal fusion, resulting in the fusing of the spine. Following this surgery, appellant was able to return to work and did not suffer pain and disability until, in 1960, she slipped and fell on ice and then began to have further pain in her back. She continued to work in a factory in Chicago until June 27, 1963, when, according to her evidence, while at work, she became unable to move her legs and had pain so severe, she had to quit work.

On July 3, 1963, after her return home to Kentucky, Dr. M. D. Flanary of Pikeville, Kentucky, examined appellant and reported that he found her to be totally disabled.

On October 25, 1963, Dr. Flanary reported to the Social Security Administration that he had again examined appellant; that X-rays revealed an old ruptured disc between the 4th and 5th lumbar vertebrae; that she was suffering from arthritis of both knees, and that she was totally and permanently disabled.

On February 12, 1964, Dr. Flanary reported that on that day he had again examined appellant and had taken X-rays of her. He stated that she had been operated on in 1953 for a ruptured disc—which was not successful—and that she was totally and permanently disabled.

On December 6, 1963, appellant had been given a consultative examination at the Memorial Medical Center, at Williamson, West Virginia, by Dr. A. A. Grebe, which was supplemented by an X-ray examination by Dr. Arthur E. Levy. The report of Dr. Grebe's examination made reference to the prior spinal fusion and various ranges of motion of appellant's knees, leg raising, and the like. The main relevant part of the report, bearing on appellant's claim, is the finding of Dr.

Grebe that: "In testing sensation to pin prick, there was hypesthesia to pin prick over all of the toes of the right foot which extended to just below the right ankle joint." This means that appellant could feel little sensation to pin pricks throughout that area of her foot and ankle. Dr. Grebe's diagnoses were: 1. Obesity; 2. Residuals of lumbar disc disease, manifested by subjective complaint of low back pain and by hypesthesia to pin prick of the toes of the right foot.

Dr. Francis A. Scott, who had performed the excision of the protruding disc and the spinal fusion surgery on appellant in 1953, examined appellant again on June 30, 1964, and stated that appellant had been "symptom free" until 1960. He further reported: "Since that time (1960) she had had intermittent trouble. Her complaints are pain in back and leg, pain in right shoulder with use, and pain in head. She is an obese woman, weighing 210 pounds. Because of her obesity and arthritic changes this patient is certainly disabled from doing heavy physical work."

On February 24, 1964, in an official report, designated a "Report of Contact," by the representative of the Social Security Administration, it was stated:

"MEDICAL CARE AND TREATMENT: The wage earner goes to Dr. Flannary about every 2 weeks for treatment. She has had no recent hospitalization. When she goes to Dr. Flannary, he x-rays her and gives her pain tablets and ointment. This physician has advised her that she will have her condition always and there is no improvement to be expected. He has advised her to soak her back in hot water for 30 minutes at a time twice a day and to stay off her feet. Her medication does not seem to help. She says she is not able to work because she can't bend and she can't stand. She is unable to lift anything. When she sits for any length of time her legs go to sleep. The only relief of the severe pain in her back is when she is lying down and lying extremely still.

If she moves around even lying she has very severe pain. * * *

* * * * * *

"OTHER SIGNIFICANT FACTORS: [She] seems to understand the denial of her claim and the reasons for such, but definitely and firmly she feels she is totally disabled and disagrees with the decision. * * *

"OBSERVATIONS: * * * She was cooperative in her attitude, but she did seem to be somewhat downcast over her physical condition. She expresses herself well and she presented a neat appearance. * * *"

In the course of appellant's testimony before the Hearing Examiner, she referred to her last job in Chicago, and stated that:

"[On] all these jobs I got I never did pass the medical examination. On the 27th day of June '63, I got away from my machine and I couldn't move my legs. I was working on * * * one of the main big machines. * * * I couldn't move my legs, but with help I did. I call it circulation. I don't know what it is, and pains in it and in my back."

The Hearing Examiner continued the questioning:

"Q. You quit the job then?

"A. I had to. They took me to the doctor and the clinic, * * * I can't give you the name of it. The doctor told them it was from my spine and he found where I had had this operation.

"Q. Did you come back to Kentucky?

"A. Well, my vacation was up the 29th of June so I didn't go back to work. I stayed there five days and came home on vacation and when I got here, I was down, you know, I couldn't move hardly. I was brought to Dr. Flanary down here. There's no orthopedist in this town and he x-rayed me and he told me I would just have to give it up.

"Q. You just stayed in Kentucky then?

"A. No, then I went back. I went back to Chicago. I had to get my things and I went and told the company and they said they couldn't work me nohow because they said the insurance company wouldn't carry me and I had filled out my application falsely when they asked me for operations, and they couldn't work me without insurance and the insurance company wouldn't carry me.

"Q. Did you ask them to take you back on?

"A. Ask them to take me back? Yes, and was intending to go back to work and Ken, the guy that ran the plant, you know, he was the owner, he told me, he said 'Vera, you're a good worker' but he said, 'Honey, I can't work you. I've got a cousin that [is] now in the wheel chair from that.' He said 'I won't work you or neither will the insurance company carry you.'

"Q. Did you try anywhere else?

"A. No, not after that.

"Q. Did you come back to Kentucky then?

"A. Yes, then I came back to Kentucky.

"Q. And you haven't tried to find work around here?

"A. No, I can't work. My back and legs won't let me.

* * * * * *

"Q. I don't have any more questions. Is there anything more you want to tell me?

"A. Well, speaking of getting jobs. You see, I have always found a place where I never had to take a medical examination for a job. I've had good jobs, you know, all but taking my examination and then when they come to that, they'd just say, 'You've got no business on a job. You're not fit for public work.' They would turn me down. I had to always find a place where I could take a job without examination and I would fill my application out as no operations, you see, and my insurance would always come

through and they didn't know nothing about it, you see. That's the only way that I could get a job. That's the way I have worked. I was turned down at Rollin's Tool Company in Chicago and I was turned down at U. S. Rubber.

"Q. When was that?

"A. That was the year of '63.

"Q. Both those places?

"A. Yes, I was turned down except when I got a job—except when I went in for a medical examination. You had to take one on that job and they said, 'Oh, no, you don't go to work for us.' So that's it. I always had to find a place where there wasn't no medical examination required, you see.

"Q. * * *—That was on your last visit to Chicago?

"A. That was right after I lost the job with Felt Products.

"Q. Did you apply any place else besides Rollins Tool Company and U. S. Rubber?

"A. Yes, I tried at Hazel Bishop Cosmetics and an envelope factory and a shoe factory, and I was turned down because I would have to stand on my feet and they just told me that I couldn't handle it because it was standing on concrete.

* * * * * *

See, every doctor that I'd go to, whenever this would get to botherin' me, why, they would always check me for kidney trouble or something like that, you see. I wouldn't tell them of the operation and then when they would find this out, they would say, 'Why do you want a job in the first place?' Well, you have to work. They'd say, 'Get off of the job. You've got no business on it. * * * You're only just making yourself worse by trying to hold a job and you're going to keep on until you take to a wheel chair.' "

Appellant's own testimony that she was totally and permanently disabled was uncontradicted, persuasive and was supported by the substantial evidence in the case.

As heretofore pointed out, appellant's own family physician, whom she saw every two weeks after leaving her job in Chicago, reported that he had examined her in July 1963, in October 1963—after having X-rays taken, and in February 1964, with further X-rays, and, on each occasion, he reported to the Social Security Administration that appellant was totally and permanently disabled. In the course of these examinations, he reported on the effect of the old ruptured disc, and her suffering arthritis in both knees. Dr. Flanary's evidence was undisputed, with only two other doctors filing statements in the case, in which they reported that appellant had residuals of lumbar disc disease, manifested by low back pain and hypesthesia to pin prick in the right foot, as well as intermittent trouble after the surgical operation, together with arthritic changes. There was no evidence of any kind in any of the medical reports to the effect that appellant could do any work of a substantial gainful nature.

Appellant testified in detail about the pain she suffered in trying to carry on her work—of the severe pains in her back, of her legs crumpling under her, and her inability to stand for more than an hour before her legs became numb and pained her. The Hearing Examiner did not find that she did not suffer such pain.

Why, then, did the Hearing Examiner deny appellant's claim on the ground she had failed to establish her inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment?

We find, at least, four instances of error in the Hearing Examiner's findings, which were affirmed—all of them constituting prejudicial and reversible error.

Before discussing the law and the evidence, it is well to bear in mind the holding of Judge Hogan that, running through the whole concept of the substantial evidence test in respect to reviewing findings of the Secretary of Health, Education, and Welfare with re-

gard to Social Security matters, as a principal thread, is the idea that fact findings are acceptable only where it is evident that correct legal standards have been employed by the trier of the facts. Colegate v. Gardner, 265 F.Supp. 987 (D.C.S.D.Ohio).

In the first place, in deciding the case, the Hearing Examiner relied upon and stated a rule in which he declared that "[the] courts have held that pain in itself is not enough to constitute a disabling impairment. In the case of Theberge v. United States, 87 F.2d 697, 698, Judge Learned Hand stated:

'A man may have to endure discomfort and pain and not be totally disabled; much of the best work of life goes on under such disabilities; * * * The only work available to the insured must do more than hurt, it must substantially aggravate his malady.' "

This rule has been specifically discredited, in these disability cases, by this court on so many occasions that it would appear that the Hearing Examiners are resolved to decide these cases, involving pain, on grounds directly contrary to the decisions of this court and the many other adjudications of the federal courts in these disability cases.

As an instance, in the case of Polly v. Gardner, Secretary, 364 F.2d 969, 972, 973 (C.A.6), this court said:

"Furthermore, the Hearing Examiner based his decision on an additional erroneous conception of the law which has been repeatedly pointed out by this court, in the reversal of many of these disability benefit cases. The Hearing Examiner, in his decision, relied upon, and quoted, the following from Theberge v. United States, 87 F.2d 697 (C.A.2):

" ' 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work in life goes on under such disabilities. The only work available to the insured must do more than hurt, it must substantially aggravate his malady.'

"On countless occasions, we have refused to consider the Theberge case as of any authority or consequence, and have expressly declared that we would not follow it.

"In Miracle v. Celebrezze, 351 F.2d 361 (C.A.6) this court held:

" ' 'This case starts out with a primary reversible error to the disadvantage of a poverty-stricken man suffering from pain incurred during a lifetime of hard labor. The keystone of the decision by the Hearing Examiner, which was adopted by the Secretary of Health, Education and Welfare and which constitutes the basis of the judgment from which appeal is taken, states:

" ' ' 'Granting that the claimant has experienced some pain, the fact that an individual is unable to work without some pain and discomfort does not justify a finding of disability. In Theberge v. U. S. [2 Cir.] 87 F.2d 697, Judge Learned Hand stated: 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities. The only work available to the insured must do more than hurt, it must substantially aggravate his malady.' "

* * *

" 'This court has repeatedly held that it will not follow the holding in Theberge v. United States, 2 Cir., 87 F.2d 697, but that rather, we follow the holding and notable decision in Butler v. Flemming, 288 F.2d 591, 595 (C.A.5), in which Judge Brown, speaking for the court, said:

" ' ' 'If, as suggested in the Government's brief, Hallard v. Fleming, D.C.W.D.Ark., 1958, 167 F.Supp. 205, and Judge Learned Hand's statements in Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, 698, concerning a different statute enacted for a different policy in a different era, are to stand for the proposition that pain, no matter how severe, is not disabling unless work does 'more

than hurt' so that it 'substantially aggravate[s] his malady,' 87 F.2d at page 698, we regard them as contrary to the standard announced in Booker and Kerner and many others like them. Perhaps it is true that history teaches that 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities. * * *, *But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes.* Congress has in effect stated that if a person is unable except under great pain to engage in any substantive gainful activity which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act.' " (Emphasis supplied.)

In Henninger v. Celebrezze, 6 Cir., 349 F.2d 808, 814, this court held that it would not follow the rule in Theberge v. United States, 2 Cir., 87 F.2d 697, on pain, which the Hearing Examiner followed in this case, but would rather follow the notable opinion of Judge Brown in Butler v. Flemming, 288 F.2d 591, 595 (C.A.5).

In Massey v. Celebrezze, 345 F.2d 146 (C.A.6) this court again repeated that the standard in the *Theberge* case, relied upon by the Hearing Examiner, in the instant case, was contrary to the proper standard of disability resulting from pain, and that a decision based thereon resulted in reversible error. All of the foregoing cases are in keeping with the authorities of the federal courts in like adjudications.

 If a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he is deemed disabled for purposes of the Social Security Act. Smith v. Celebrezze, 229 F.Supp. 827 (D.C.N.C.).

Even pain unaccompanied by any objectively observable symptoms, which is nevertheless real to the sufferer and so intense as to be disabling, will support a claim for disability benefits. Ber v. Celebrezze, 332 F.2d 293 (C.A.2). The fact that there is such a subjective symptom as pain of claimant for social security benefits does not mean that it ranks as a lesser type of disability. Blanscet v. Ribicoff, 201 F.Supp. 257 (D.C.Ark.). The notion that pain must be endured, that pain, no matter how severe or overpowering, is not disabling unless it will substantially aggravate a condition, is contrary to law under disability provisions of the Social Security Act which were intended to ameliorate some of the rigors that life imposes. Page v. Celebrezze, 311 F.2d 757 (C.A. 5). The criteria to be considered in determining a claimant's ability or inability to engage in substantial gainful activity, for purposes of determining his right to social security disability benefits, are objective medical facts, diagnoses, and expert medical opinions on subsidiary questions of fact, subjective evidence of pain and disability testified to by claimant, and claimant's educational background, work history and present age. Helton v. Celebrezze, 220 F.Supp. 759 (W.D.N.C.); affirmed 331 F.2d 342 (C. A.4).

In Drafts v. Celebrezze, D.C., 240 F. Supp. 535, 538, the court said:

"Pain was brushed aside as a subjective non-entity. Well reasoned opinions and the obvious purposes of the Act compel that great consideration be accorded to that merciless entity called 'pain.' The fact that some extraordinary individuals can bear it and perform unflinchingly does not mean that such heroics is the 'standard.' The criterion is not even the standard of the ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities."

 The Hearing Examiner in this case, whose decision was affirmed by the Appeals Council and the District

Court, was guilty of reversible error in holding that pain, in itself, was not enough to constitute a disabling impairment, and that the pain which appellant suffered must do more than hurt, and, in order to be considered disabling, must substantially aggravate the malady. This holding, which, as we have remarked, has been held to be reversible error in so many of the cases decided by this court during the past several years, always appears in the decisions of the Hearing Examiners involving pain which is claimed to be disabling; and, since we have never been asked by the Secretary to overrule our repeated decisions on the subject, the reason for such holdings eludes our speculation. All that this kind of thing does is pile up tremendous records, on appeal, that, in spite of reversible error, must be meticulously examined by already overburdened courts to ensure a just and legal determination of an applicant's rights.

■ The second reversible error committed by the Hearing Examiner was his holding that the impairment must be medically determinable and in order to be medically determinable, "the existence of the impairment must be established by objective medical, clinical, or laboratory evidence." The Hearing Examiner stated further, that pain is only a subjective symptom that cannot be accurately measured, and, in itself, is not disabling; and he concluded his decision in holding that appellant could not be disabled through pain alone by stating: "The Hearing Examiner finds that there is no objective medical evidence to support a conclusion that the claimant is suffering pain sufficient to make her disabled within the meaning of the Act."

The holding by the Hearing Examiner that "medically determinable" means "supported by objective clinical or laboratory evidence" is clearly erroneous.

In Ross v. Gardner, Secretary, 365 F. 2d 554 (C.A.6), in reversing a judgment in favor of the Secretary, this court said:

"Obviously, the Hearing Examiner in this case, as in other cases coming to our attention, assumed that 'medically determinable' means 'supported by objective clinical findings and reports.' The Act means nothing of the kind.

"Mental impairment alone may result in disability entitling the one suffering therefrom to disability benefits under the Social Security Act. Such impairment may be medically determinable but, in few cases, could a conclusion of such impairment be supported by objective clinical findings. See Hill v. Celebrezze, 233 F.Supp. 298 (D.C.E.D.S.C.).

"Pain unaccompanied by any objectively observable symptoms, may be so real and so intense as to be disabling, and will support a claim for disability benefits. Ber v. Celebrezze, 332 F.2d 293 (C.A.2). The fact that there is such a subjective symptom as pain of claimant for social security benefits does not mean that it ranks as a lesser type of disability. Blanscet v. Ribicoff, 201 F.Supp. 257 (D.C. Ark.).

"There is no requirement that a physician's evidence or testimony must be supported by objective clinical findings. Page v. Celebrezze, 311 F.2d 757 (C.A.5); Lightcap v. Celebrezze, 214 F.Supp. 209 (D.C.Pa.).

"It was error on the part of the Hearing Examiner to hold, in this case, that the physician's opinions or conclusions must be supported by adequate objective clinical findings."

■ The third reversible error committed by the Hearing Examiner was in holding that the fact that employers would not hire appellant because of the "insurance problem" resulting from her inability to pass a medical examination, did not place her under a disability.

Appellant had testified before the Hearing Examiner that she had secured employment in Chicago and elsewhere after her injury started to cause her pain, because she was able to avoid

taking the companies' medical examinations. On the first occasion when an employer discovered her physical condition, she testified, "they said they couldn't work me nohow because they said the insurance company wouldn't carry me * * * and they couldn't work me without insurance and the insurance company wouldn't carry me." One of the owners of a place where appellant worked, and where she intended to resume work after she had first become disabled, told her that she was a good worker, but that he had a cousin who was in a wheel chair as a result of working when he was in a disabled condition. The owner told appellant: "I won't work you or neither will the insurance company carry you." Whenever appellant had to take a medical examination for employment, the employer would say: "You've got no business on a job. You're not fit for public work." On one job she took a medical examination, "and they said, 'Oh, no, you don't go to work for us.'" All of the time appellant was seeking employment, after she lost her prior job because of being disabled, she was suffering pain; and, although she tried to secure employment at seven different companies afterward, they all refused to employ her because of her physical condition and inability to pass a medical examination. Finally, her efforts to find employment were terminated only when employers told her: "You're only just making yourself worse by trying to hold a job and you're going to keep on until you take to a wheel chair"; and when she finally went back to her home in Kentucky, the Hearing Examiner asked her if she had tried to find work there, and her reply then was: "I can't work. My back and legs won't let me."

We proceed, then, to the authorities— undisputed and unquestioned—that hold that if, in practice, a claimant could not reasonably expect to be hired, then no job exists for her, and that, if the hiring practices and policies of employers will not permit the employment of a woman, who, because of impairment, cannot carry her load, then she must be considered disabled.

In Gardner v. Smith, 368 F.2d 77, 84 (C.A.5), the court said:

"If a physical or mental impairment prevents one from obtaining a job, or from even being considered for the job, he is just as unable to engage in that activity as he would be were he unable to perform the work after he had obtained the employment. The ability to perform work existing in the appropriate labor market requires a determination of whether the claimant would be considered for employment if a job vacancy occurred. *If, in practice, the claimant could not reasonably expect to be hired, then no job exists for him. The Act asks if the claimant is able to engage in substantial gainful work. If no one would hire him, he cannot engage in substantial gainful work.* Extended to its broadest reaches, the Secretary's position would nullify the purpose of the Act, for, unless the claimant is bedridden and incapable of any movement, there most probably is some work he physically could do, though there might be no likelihood that he could successfully compete for the job.

\* \* \* \* \* \*

"It would be wholly unrealistic to hold that though no employer would hire a person because of his physical or mental impairment, the person is still not disabled because he could do certain tasks or duties connected with jobs existing within the labor market. In such a situation there really exists an inability to engage in substantial gainful activity by reason of impairment, when but for the impairment, the person could compete for a job."

The court further said:

"We conclude that the Secretary failed to employ the proper legal standards in making his determination of the claimant's disability. There should have been a determination by the Secretary of whether or not the claimant's physical or mental impairment would

prevent him from being hired to fill jobs, if such jobs were open in the area in which the claimant could reasonably be expected to compete. *If the hiring practices and policies of employers will not permit the employment of a man, who because of an impairment could not 'carry his load,' then he must be considered disabled."* (Emphasis supplied.)

In Gardner v. Brian, 369 F.2d 443, 447 (C.A.10), the court said:

"The consultant also recognized the claimant's problem of gaining access to companies which would be involved in pension plans and insurance plans and that more and more this is becoming a handicap to the worker in the post 50's and particularly those that have some kind of limitation. Indeed, the Fifth Circuit in Gardner v. Smith, 368 F.2d 77, (C.A.5), again recognized this availability problem with the observation that disability includes physical or mental impairment which not only prevents one from obtaining a job, but from even being considered for it by reason of hiring practices and policies."

See to same effect Bridges v. Gardner, 5 Cir., 368 F.2d 86.

In Thomas v. Celebrezze, 331 F.2d 541, 546 (C.A.4), the court emphasized the desirability of having the Secretary focus on the question of disability from the standpoint of an employer; and, in holding that the claimant in that case could not reasonably hope to be hired, said:

"Employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs. It is unrealistic to think that they would hire anyone with the impairments of this claimant."

In Williams v. Celebrezze, 359 F.2d 950, 952 (C.A.4), the court, in holding that the Hearing Examiner had erred in determining that the applicant was not entitled to disability said:

"Furthermore, should the examiner determine that Williams might reasonably be required to move to an industrialized area and there seek employment he must determine whether an illiterate 52 year old with no prior training in any industrial job, with a history of some disability and claims of more, with a rural oriented background would be employable in jobs available in such area. If such jobs are available only in modern industrial employment, consideration must also be given to a realistic analysis of the problems involved in such employment,[1] in addition to the mere physical

"1. This would include consideration of the effect upon employment policies of such factors as company health insurance plans, workmen's compensation, and other fringe benefits.

capacity to perform the job."

In Cooke v. Celebrezze, 365 F.2d 425, 428 (C.A.4), Judge Sobeloff, speaking for the court, summed up the foregoing authorities, in reversing a holding of the Secretary that certain jobs were available to an applicant for disability benefits, in the following language:

"It is a matter of common knowledge that employers are hesitant to hire the handicapped, particularly if they have no special skills. *The prospective employer's fear of absenteeism, the possibility of higher workmen's compensation premiums, and uncertainty whether such an employee will be able to perform his work satisfactorily,* are factors militating against the abstract judgment that jobs are available to this man. Quite correctly the District Court held that the government's evidence, viewed in light of the record as a whole, was insufficient to sustain the Secretary's finding." (Emphasis supplied.)

As the court said in Morton v. Gardner, D.C., 257 F.Supp. 67, 74:

"It has already been judicially recognized that employers are concerned with substantial capacity, psychological stability and steady attendance in the

selection of their employees, that their health and liability insurance costs will not be unduly increased."

■ All of the foregoing cases, undisputed and uncontradicted, support the rule that where the hiring practices of employers, based on health insurance, workmen's compensation premiums, and liability insurance, preclude the hiring of an employee because of his physical impairment, he must, under the statute, be considered disabled for all the kinds of work he has previously done in such employment, and for all such employment in the future.

■ The Hearing Examiner committed reversible error in ignoring the medical evidence of the total and permanent disability of appellant, and deciding the case on the basis of what he considered his own expertise, and on erroneous conceptions of law. Appellant's physician stated she was totally and permanently disabled. There was no contradictory evidence.

In Teeter v. Flemming, 7 Cir., 270 F.2d 871, 874, 77 A.L.R.2d 636, the court said:

"The expert opinion of Dr. Morris as to disability and inability to engage in any substantial, gainful employment, was admissible evidence for consideration by the referee and not, in itself, binding on him. But as it was not controverted by substantial evidence to the contrary, the referee's adverse decision on the ultimate fact was properly set aside. Hill v. Fleming, D.C.Pa. 1958, 169 F.Supp. 240, 245."

In Hill v. Fleming, D.C., 169 F.Supp. 240, 245, it is stated:

"In our opinion there was no substantial evidence to contradict the medical opinions that plaintiff was totally and permanently disabled; neither was there any affirmative evidence that he had or could have, in view of his limited education and physical condition, engaged in any substantial gainful employment.

"Expert opinions on such issues are admissible evidence to be considered by the fact finder, but when they are not repudiated in any respect by substantial evidence to the contrary, an adverse decision on these ultimate facts should be set aside as based on 'suspicion' and 'speculation'."

In Gaden v. Gardner, D.C., 263 F.Supp. 374, 376, the court said:

"In this instance we have the claimant's and her physicians' evidence as to her disability. It is unequivocal. There is no countervailing evidence at all. The examiner's dissatisfaction with the claim was based only on surmise and conjecture that the evidence submitted was somehow faulty and inadequate. The court cannot agree. It is not expected that the claimant's burden should be carried to a point beyond a reasonable doubt."

In Celebrezze v. Warren, 339 F.2d 833 (C.A.10), it was held that where "uncontradicted medical evidence tended to establish disability of claimant, the decision of the Secretary denying benefits was not supported by substantial evidence."

In Miracle v. Celebrezze, 351 F.2d 361, 378 (C.A.6), the court said:

"When a claimant comes forth with evidence of serious physical impairment, the record must contain evidence on which the denial of the claim may be based; and where there is uncontroverted medical testimony that the applicant is unable to engage in any substantial gainful activity it is the duty of the Secretary of Health, Education, and Welfare to award him the relief requested, assuming that all other qualifications are met."

In Ross v. Gardner, 365 F.2d 554, 558, 559 (C.A.6), the court said:

"Moreover, the Hearing Examiner further committed error in his decision in holding:

" 'The Hearing Examiner cannot make a finding of "disability" based solely upon the opinion or conclusion expressed by a physician.'

"This is contrary to our holding in Hall v. Celebrezze, supra, at 689, where it was held:

"'The Secretary gave no weight to the uncontradicted opinion evidence of Doctors Scott and Blair heretofore set forth with respect to Hall's disability. Since the statute required that the disability result from a "medically determinable physical or mental impairment." (42 U.S.C.A. § 416(i) (1) and § 423 (c) (2)), the claimant had no way of establishing his case if his credible medical evidence is disregarded.'"

In Hilber v. Ribicoff, 196 F.Supp. 460 (D.C.Mont.), the court said:

"Where a Hearing Examiner has received expert opinions on the issue of a claimant's ability to work and they are not repudiated in any respect by substantial evidence, an adverse decision should be set aside as based on suspicion and speculation."

In Kelly v. Celebrezze, D.C., 220 F.Supp. 611, 615, the court said:

"The expert opinions of physicians as to disability are not binding on the Examiner, but an expert opinion to that effect which is not seriously controverted by substantial evidence to the contrary supplies this court with a proper ground, inter alia, for reversal."

On the basis of the Hearing Examiner's ignoring the undisputed evidence of appellant's total and permanent disability, the case must be reversed.

The evidence supports appellant's claim for disability benefits; and there is no evidence to support a contrary finding.

In McGaha v. Ribicoff, 262 F.Supp. 161, 163, the court said:

"The question of what amounts to substantial evidence is a matter of law, and the Court is required to review the entire record to determine as a matter of law whether there is substantial evidence to support the defendant's finding that plaintiff was not disabled at the critical time."

A review of the entire record clearly indicates that the findings of the Hearing Examiner are not supported by substantial evidence.

In Miracle v. Celebrezze, 351 F.2d 361, 382 (C.A.6), this court quoted with approval the following:

"Where a claimant * * * has failed to make an effort to obtain employment, it seems obvious that a finding of non-disability can be supported on less evidence than where a claimant has attempted unsuccessfully to obtain employment, or, having found employment, has been unable to carry it through." Sanders v. Celebrezze, 225 F.Supp. 836, 842 (D.C.Minn.)

"'If there is no market for the services [the claimant] is able to render, then he is truly disabled within the meaning of the statute.' Ferran v. Flemming, 293 F.2d 568, 571 (5th Cir. 1961)." Wells v. Celebrezze, 209 F.Supp. 444, 447 (D.C.W.D.N.C.).

The Hearing Examiner saw from one of the medical reports, and probably also from observing her as a witness, that appellant was obese; and from the mention of this fact and without any further evidence upon the subject, he found: "Obesity is not a disabling condition under the Act as it is, in almost all cases, remediable. It may well be that she would have less pain and discomfort if she would lose some weight." It is difficult to ascertain whether the Hearing Examiner was making a gratuitous derogatory remark about appellant, or whether he was entering a finding that her condition was remediable. Whatever conclusion he arrived at on this score, he obviously forgot that appellant had always been obese and weighed approximately 195 pounds not only at the time she underwent the medical examinations as a basis of securing disability benefits and at the time of the hearing, but was also of the same weight during all of her working years. This was no justification for the Hearing Examiner's medical opinion that appellant would suffer less pain if she lost some weight.

The Hearing Examiner further found:
"The claimant's principal complaint appears to be back pain, which is a subjective symptom that cannot be accurately measured. An orthopedic authority has stated in this connection:

> " 'Surgery of the prolapsed intervertebral disc is essentially a surgery of pain. The severity of pain, its duration, and the resulting disability in the economic sense, are the chief considerations for surgical intervention. * * * The surgical treatment of backache and sciatica due to protruded intervertebral disc fulfills its purpose—the abolition or relief of pain—in the vast majority of cases.' Orthopedic Surgery, by Dr. Walter Mercer, 4th Ed., 1960, pp. 663, 668.

"Another authority has stated:

> " 'The convalescence from a simple disc excision is comparatively rapid. Pain relief in the classical case is dramatic, unless root pressure has been present for a prolonged period. Concor's Arthritis and Allied Conditions, 5th Ed., 1953, p. 1064.' "

In a similar instance when the Hearing Examiner quoted from medical works which had not even been introduced in evidence, this court, in Ross v. Gardner, 365 F.2d 554, 556 (C.A.6), said:

"The first time that this language of a medical text appeared in the case was in the Hearing Examiner's decision. Appellant, a poor woman, was without counsel on the hearing.

"In Glendenning v. Ribicoff, D.C., 213 F.Supp. 301, 302, 303, it is said:

> " 'In weighing the evidence, the hearing examiner, who is not shown to be a medical specialist, undertook to discredit the opinion of the orthopedic surgeon, Dr. Overesch, by independent medical research and citations to medical texts without prior notice to the plaintiff and without the benefit of interpretation by professionally competent specialists. * * *

> " 'The consideration of this extra-record medical information was erroneous as a matter of law, even if it be assumed that under proper conditions such extra-record information could be noticed and considered by the examiner, a matter not free of doubt. Administrative agents and agencies are not privileged to take judicial notice of evidentiary material which is not a matter of common knowledge. To do so denies to the affected party "the fundamentals of a trial," in the words of Mr. Justice Cardozo, speaking for a unanimous Court, in Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S.Ct. 724, 728, 729, 81 L.Ed. 1093, l.c. 1099. The practice of noticing evidentiary material after the case has been submitted amounts to a "pretext for dispensing with the trial." Ohio Bell Telephone Co., supra.'

"In Cook v. Celebrezze, 217 F.Supp. 366, 368 (D.C.W.D.Mo.), the court said:

> " 'The hearing examiner made a finding contrary to this medical evidence, relying chiefly upon an electroencephalographic report from the Veterans Administration Hospital, Kansas City, Missouri, the significance of which was not evaluated by a qualified medical expert. Exhibit 5, transcript page 59, l.c. 61. The examiner stated:

> > " ' "A normal encephalogram, the only specific laboratory evidence in the whole record, discounts and negates the existence of any cerebral lesion characteristic of any kind of epilepsy and the claimant's own testimony when questioned at the hearing to describe these so-called blackouts, i. e., that he gets dizzy, finds a dark place, passes out, vomits and has headaches, is entirely uncharacteristic of epilepsy in which there are varying kinds of momentary seizures and accompanying rigidity during which the sufferer is incapable of any conscious movement or

arrangement with a total lack of awareness after the seizure has passed." '

" 'In this manner the hearing examiner, who is not shown to be a medical specialist, without the benefit of any opinion evidence from a qualified medical expert, has reached conclusions both with regard to the medical significance of a normal electroencephalographic report and the plaintiff's alleged symptoms, which no one but a qualified medical expert would be qualified to express. If the examiner's opinion is founded on special study, reading or consultation not shown in the record, the hearing examiner has made use of extra-record information, not a matter of common knowledge, from unspecified sources. The plaintiff has been given no opportunity to rebut this evidence. *Administrative agents and agencies are not privileged to take judicial notice of evidentiary material which is not a matter of common knowledge.*' " (Emphasis supplied.)

There was no evidence that appellant was not totally disabled. There was evidence that she could not engage in any substantial gainful activity. The testimony by appellant's attending physician was that she was totally and permanently disabled. There was no basis on which the Hearing Examiner could find to the contrary; and his finding that appellant was not totally and permanently disabled must be reversed.

 The proof of appellant's disability was strong, and the evidence to the contrary was lacking in substance. "After the long pendency of the application, we see no reason to remand the case for the taking of further testimony." Cyrus v. Celebrezze, 341 F.2d 192, 197 (C.A.4).

As Judge Sobeloff, speaking for the court, declared in like circumstances in Cooke v. Celebrezze, 4 Cir., 365 F.2d 425, 428:

"However, we see no useful purpose in remanding the case once more to the Secretary. Cooke has already spent five fruitless years in consultation with the West Virginia Rehabilitation Division in search of a job classification and it is clear from the vocational counselor's report that his disability and limited education—not any lack of motivation—are the chief obstacles to retraining him for a new job. No theoretical job availability that might be adduced at still another hearing can disestablish the verdict of the Rehabilitation Division after five years of proving, that this claimant's injury has effectively precluded him from engaging in any substantial gainful activities. Over eight years have elapsed since Cooke was forced to abandon his job. His claim for insurance benefits is well into its fifth year of litigation, and we think the District Court should now enter judgment for the plaintiff."

In accordance with the foregoing, the judgment is reversed and the case is remanded with directions to the Secretary to grant the claimed disability benefits.