878 F.2d 382
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
David A. THOMSON, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 88-1914.
 United States Court of Appeals, Sixth Circuit.
 July 3, 1989.
 
 Before KENNEDY, NATHANIEL R. JONES, and WELLFORD, Circuit Judges.
 PER CURIAM.
 
 
 1
 In this social security case, the ALJ denied benefits, the magistrate recommended that benefits be awarded, the district court at first adopted the magistrate's report, some benefits were paid, and then the district court reversed its own decision and denied benefits. This appeal by David A. Thomson followed.
 
 
 2
 The claimant, who was 45 at the time of the administrative hearing, last worked as a tool crib attendant. He quit work when the plant was closed, complaining of back and leg pain. He was also illiterate due to dyslexia, and had problems using his left hand because portions of two fingers were amputated following a work-related accident. Despite the uncontroverted restrictions placed on the claimant's lifting by a treating physician and a specialist, the ALJ concluded that the claimant could return to his work as a tool crib attendant, a job classified as medium to heavy in exertional requirements, primarily because Thomson had done this work with some help from others. Alternatively, the ALJ found that the claimant could perform other light work. Two doctors, however, limited the claimant's walking and standing, and a counselor's report indicated that the claimant could not sit for prolonged periods.
 
 
 3
 For the reasons stated below, we reverse the Secretary's determination that the claimant could perform his past work, and remand for a further consideration concerning Thomson's ability to perform light work.
 
 
 4
 In September 1986, the claimant was administered a battery of psychological tests at the South Park Counseling Center in Wyandotte, Michigan. The tests revealed that the claimant had a full-scale IQ of 86 and the ability to follow "rather complex instructions and directions." The results of the Wide Range Achievement Test indicated that the claimant was illiterate, and that his reading, spelling, and arithmetic levels were below that of a third grade student. Dr. Zimmer, a limited psychologist, concluded that the claimant "will require vocational counseling and a 'hands-on' training program to become employable."
 
 
 5
 In October 1986, the claimant's treating physician, Dr. Jugan, noted that the claimant evidenced muscle weakness upon getting up from the floor, and that he had a weakened grip strength in his left hand due to the loss of fingers. With regard to physical capacities, Dr. Jugan indicated that the claimant was limited in walking, climbing, standing, reaching, pushing, pulling, and lifting. He also reported that the claimant's left foot and ankle swell with activity, and that the claimant had difficulty picking up small items with his left hand.
 
 
 6
 On October 10, 1986, the claimant was examined by Dr. Kim, a physiatrist, at the request of the Michigan Rehabilitation Services. Dr. Kim found that the claimant's lumbosacral spine was limited in the range of motion, and that his lumbar lordotic curve was straightened. Straight leg elevation was limited to 80 degrees on the left and 90 degrees on the right. Pin prick sensation was normal but there was weakness on the left extensor hullas longus compared to the right side. The claimant's left calf was approximately one inch smaller than his right calf, but range of motion in his knees, ankles, and hips were normal. There was minimal tenderness in the claimant's left sacroiliac area but no tightness or spasm. The sciatic notch was slightly tender on the left side. Dr. Kim noted that the claimant had difficulty closing his left hand and exhibited a limited range of motion in the rest of his fingers. Pin prick sensation indicated a decrease in the last three fingers of the left hand. Grip strength was 100 pounds on the left as compared to 160 pounds on the right.
 
 
 7
 Dr. Kim stated that the claimant had several problems, including left lumbar radiculopathy, most likely in L5-S1. The claimant had difficulty handling small objects and could not carry heavy objects due to pain. He concluded:
 
 
 8
 Over all I couldn't find him adequate for labor type activities. If he can learn how to read then he can do desk work or light duty with the restriction of no heavy lifting or carrying more than 30 pounds, no frequent bending, no prolonged walking or standing.
 
 
 9
 On January 20, 1987, the claimant underwent electro-diagnostic tests at the request of Dr. Jugan. The reviewing physician, Dr. Robbins, found multiple abnormal readings in the nerves of the left leg, and felt that the claimant was suffering possible neuropathy at the L5 nerve root.
 
 
 10
 The claimant attempted vocational rehabilitation at the Michigan Rehabilitation Services. Although he was tested in a variety of sample jobs, involving both sedentary and manual work, because of the combination of disabilities, no jobs were identified that the claimant could perform or be trained for that did not cause excessive pain and discomfort.
 
 
 11
 At the administrative hearing, Thomson testified that his previous work as a brake operator required frequent, heavy lifting and that he requested a transfer to the crib attendant position because it was less strenuous. He explained that "I suffered the pain because I couldn't afford to lose my job." He stated that he quit work on May 30, 1986, when the company locked the workers out. He emphasized that he could not return to his former job even if the company reopened because of his leg and back problems.
 
 
 12
 Thomson stated that he tried to cut the grass but could not push the lawnmower due to pain. He can still drive, and although he tries to help his wife around the house, he can do no stooping. He occasionally does dishes, but the bending hurts his back. He indicated that his ankle swells when he stands on it too long.
 
 
 13
 Thomson stated that the only reason he graduated from high school was that the teachers "pushed" him through and gave him numerous oral examinations. He also received his driver's license because he was given an oral examination.
 
 
 14
 The vocational expert at the administrative hearing, Samuel R. Goldstein, categorized the claimant's work as a brake operator as semi-skilled and heavy. Thomson's job as tool crib attendant was essentially unskilled and medium to heavy in exertional requirements. If the claimant's testimony was credited, Goldstein concluded that the claimant could not return to any of his former jobs. Based on a hypothetical in which the individual had the same age, education, training, and background as the claimant, had a functional capacity for light work, was left hand dominant but due to an amputation had to revert to using his right hand, suffered from dyslexia, had a full-scale IQ of 86 and a low reading ability, had poor memory function, mental arithmetic, clerical speed, and abstract reading skills, and could not follow complex instructions but could follow simple instructions, Goldstein concluded that there would be between 25,000 and 35,000 jobs in the Detroit area that such an individual could perform. Such jobs would include janitorial work, light stock work, packing, shipping and receiving, and inspection jobs. If the same hypothetical individual was limited to lifting ten pounds, rather than the standard 20 pounds, and had to have freedom to move about due to back pain, Goldstein stated that light work probably would be eliminated, and that the number of available jobs would be no more than 3000 to 4000. He indicated that the hypothetical restrictions would "technically limit the person to sedentary work."
 
 
 15
 In a decision dated June 16, 1987, the ALJ found that the claimant was not disabled and could return to his prior work as a tool crib attendant. In the alternative, the ALJ found that the claimant had the residual functional capacity for light work, and applying Rule 202.16 of the grids, concluded that the claimant was not disabled. The ALJ's decision became the final decision of the Secretary when it was approved by the Appeals Council on August 31, 1987. After reviewing the case, the magistrate found that the claimant could not perform his past work and that the ALJ's finding that the claimant could perform light work was not supported by substantial evidence. The magistrate stated that the claimant met the Duncan standard for pain because his complaints of pain were supported by objective medical evidence, namely atrophy and radiculopathy. The magistrate recommended that the findings of the Secretary be reversed and the case be remanded for an award of benefits.
 
 
 16
 On February 24, 1988, Judge Suhrheinrich ordered the acceptance of the magistrate's report and recommendation, and issued a judgment in favor of the claimant. On April 28, 1988, after some benefits had been paid, however, Judge Suhrheinrich entered a judgment for the Secretary.
 
 
 17
 We must determine whether the findings of the Secretary are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The claimant bears the burden of showing, by a preponderance of the evidence, an inability to perform his past relevant work. Allen v. Califano, 613 F.2d 139 (6th Cir.1980). If the claimant meets this burden, then the Secretary has the burden of proving that the claimant is capable of performing other substantial gainful employment that exists in the national economy. Young v. Califano, 633 F.2d 469 (6th Cir.1980).
 
 
 18
 The claimant contends that substantial evidence does not support the Secretary's finding of ability to perform his past relevant work, which was categorized as medium to heavy. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of up to 25 pounds. 20 C.F.R. Sec. 404.1567(b). Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of up to 50 pounds. 20 C.F.R. Sec. 404.1567(c). Dr. Jugan, the claimant's treating physician, limited the claimant's activity in terms of walking, standing, stooping, kneeling, lifting, climbing, reaching, pushing, and pulling. Dr. Kim restricted the claimant from carrying over 30 pounds, and prohibited frequent bending or prolonged walking or standing. We are not satisfied that the ALJ properly could discount the opinions of Drs. Jugan and Kim. See Rocco v. Heckler, 826 F.2d 1348 (3d Cir.1987); Johnson v. Bowen, 817 F.2d 983 (2d Cir.1987).
 
 
 19
 The ALJ and the district court emphasized that the claimant worked until his plant closed despite his alleged impairments. Courts have held, however, that work performed after the onset date does not exclude the possibility of legal disability. See Sayers v. Gardner, 380 F.2d 940 (6th Cir.1967); Mabry v. Travelers Insurance Co., 193 F.2d 497 (6th Cir.1952) (indicating that the fact that a person worked to earn a living did not preclude a finding that he was totally and permanently disabled, even while working). The claimant testified that he applied for a less strenuous position because of his back pain and that he endured the pain because he could not afford to lose his job. Thus, the fact that the plant closing spurred the claimant's social security application is not dispositive.[1]
 
 
 20
 Even if his physical impairments did not preclude the claimant from returning to work as a tool crib attendant, his mental impairments must also be taken into account. Thomson suffers from dyslexia, a learning disorder in which letters appear backwards. Claimant successfully performed his former job only because he was familiar with the procedures and because his friends helped him to read directions and instructions. The absence of familiar surroundings and sympathetic co-workers would render employment as a tool crib attendant in another company virtually impossible.
 
 
 21
 As an alternative finding, the ALJ applied 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.16 to find the claimant not disabled because he is capable of performing light work. As the magistrate noted, while Dr. Kim's lifting limitations do not preclude the claimant from performing light work, his prohibitions against sustained walking and standing do. According to the regulations, light work involves lifting no more than 20 pounds at a time with frequent lifting of up to 10 pounds. A job will be considered light if it requires a good deal of walking or standing or involves sitting most of the time with some pushing or pulling of arm controls. 20 C.F.R. Sec. 404.1567(b). In order to perform a full range of light work, a claimant must be able to stand or walk, on and off, for approximately six hours in an eight-hour work day. POMS Sec. DI 25035.030. The counselor at the Michigan Rehabilitative Services noted that the claimant frequently had to stop and walk around to ease his back pain, and Thomson testified that he had trouble sitting or standing for long periods. The vocational expert indicated that light work might be precluded, depending on how long the claimant could sit. If he could sit for 30 to 35 minutes, light work might be possible. If he could sit for only 5 to 10 minutes, light work would be impossible. Because there were no specific findings on the length of time claimant could sit, a remand is necessary.
 
 
 22
 We REVERSE the district court's finding that the Secretary's denial of benefits was supported by substantial evidence insofar as it related to the claimant's past work, and we REMAND for a determination of whether the claimant can perform light work. Because of the claimant's nonexertional impairments and his hand problems, the testimony of a vocational expert will be required.
 
 
 
 [1]
 Appellan notes that he turned 45, a significant age under the grids, only 28 days before the plant closed