**Arthur MORTON, Plaintiff,**

**v.**

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.**

**No. 933.**

United States District Court
S. D. West Virginia,
Bluefield Division.
Aug. 16, 1966.

J. N. Harman, III, Welch, W. Va., for plaintiff.

Milton J. Ferguson, U. S. Atty., Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action under Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. A decision by a hearing examiner on August 31, 1965, became the final decision of the Secretary on December 22, 1965, when the Appeals Council affirmed it. The final decision holds that plaintiff is not entitled to a period of disability or disability insurance benefits under the provisions of the Act prior or subsequent to the 1965 Amendments,[1] on the basis of his application filed October 3, 1963.

■ Plaintiff meets the earnings requirements of 42 U.S.C.A. §§ 416(i) and 423(c) through the quarter ending March 31, 1967. Under the Act, 42 U.S. C.A. § 416(i) (1), an individual shall not be considered to be under a disability

1. Section 303(a) of Public Law 89–97 (the 1965 Social Security Act Amendments) amends the meaning of the term "disability" as found in 42 U.S.C.A. § 423 as follows: "(I)nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months * * *." "Disability" had previously been defined as "(I)nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."

Under the provisions of Section 303(f) of the law a period of disability may be established by use of this amended definition. However, benefits would only be payable beginning in September of 1965 or the seventh month in which an individual has been determined to be under a disability under the amended test, whichever is later.

unless he furnishes such proof of the existence thereof as may be required. Thus, the burden is upon the plaintiff to establish by credible evidence that he was disabled within the meaning of the Act prior to December 22, 1965, when the decision of the Secretary became final, though it need not be carried beyond a reasonable doubt. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964).

 The standard of review in actions of this nature is found in Section 205(g) of the Social Security Act, as amended, and is as follows:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

In short, the Courts are not to try the case de novo, and if the findings of the Secretary are supported by substantial evidence, the Courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). Nevertheless, it is said that this provision of the law does not contemplate that the Courts should surrender their "traditional function," but rather that they will view the record as a whole, not for the purpose of making an independent finding, but to determine whether or not the finding is supported by substantial evidence and to see to it that the Administrative Agency does not act arbitrarily or capriciously in denying just claims or allowing unworthy ones. Thomas v. Celebrezze, supra; Underwood v. Ribicoff, supra; Snyder v. Ribicoff, 307 F. 2d 518 (4th Cir. 1962). In determining the meaning of "substantial evidence," the Courts have held it to be more than a scintilla, but less then a preponderance. Thomas v. Celebrezze, supra. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole. Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). The Fourth Circuit has pointed out that if there is only a slight preponderance of the evidence on one side or the other, the Secretary's findings must be affirmed. Underwood v. Ribicoff, supra. There-fore, the immediate task of this Court is to determine whether the defendant's denial of the plaintiff's claim is supported by substantial evidence.

Plaintiff filed an application for a period of disability and for disability insurance benefits on October 3, 1963, alleging that he became unable to work on April 9, 1962, due to "strained back, arthritis, sugar diabetes, high blood." The record shows that plaintiff injured his back August 30, 1961, while attempting to turn over a large piece of coal and that he was hospitalized at the Bluefield Sanitarium, Bluefield, West Virginia, from September 1 to September 13, 1961. He returned to work in the mine on January 22, 1962, but ceased working in April of 1962 because of his back condition. He has not worked since that time.

Plaintiff was born August 18, 1916, in Perry County, Alabama; is married and has no living children. He has never attended school and is illiterate. He was reared on a farm and did menial farm work and some sawmill work before coming to West Virginia to work in the coal mines. He began work for the Jacobs Fork Coal Company in 1941 and worked steadily for them until the time of his alleged disability.

Plaintiff's medical history since his back strain of August 30, 1961 is as follows: In a letter dated November 13, 1961, Dr. R. R. Raub, specialist in orthopedic surgery, Bluefield Sanitarium, indicated that during the period of hospitalization for his back injury in September of 1961, he had been placed on conservative management and though he was improved, he was still not ready for work. Plaintiff was described as somewhat obese with a rather marked tenderness in the whole low back but primarily in the lumbosacral region. Forward flexion was described as markedly limited and quite painful. Mild scoliosis was noted. X-ray indicated no bone injury, however, definite lumbosacral arthritis with narrowing of the joint and reactive changes were noted. The impressions were low back sprain, superimposed on

lumbosacral arthritis. A lumbosacral support was recommended.

Plaintiff was again hospitalized at the Bluefield Sanitarium on April 23, 1962 and was discharged on May 2, 1962. This hospitalization followed his having returned to work in January of 1962 and was the result of severe back pain. Dr. Raub, in a report dated May 21, 1962, stated that he had been placed at rest, sedated, placed on a hard bed, sent to physiotherapy and evaluated, and that no definite disc lesion could be found. Plaintiff was described as feeling considerably better on discharge but not improved to the extent that he could return to work. When seen on May 9, 1962, it was observed that he could bend over and touch his toes, but he had some pain in his back.

In a report to the Medical Division of the State Compensation Department, dated July 26, 1962, Dr. Raub noted that plaintiff was seen several times as an outpatient and that he had a good range of motion and was feeling much better. Dr. Raub did not feel that any surgery was indicated, but he noted it would be wise to have neurosurgical consultation to determine if there was nerve root compression. In an August 10, 1962 letter to the State Compensation Department, Dr. Raub suggested that, in view of plaintiff's marked complaints and the period for which he had been off from work, he be rated for a disability. It was the doctor's opinion that the prime problem was pre-existing degenerative arthritis aggravated by the August 1961 injury.

An X-ray report from the Laird Memorial Hospital, Montgomery, West Virginia, dated September 4, 1962, indicated moderated osteoarthritic changes in the lower lumbar area with the body of L–4 displaced slightly upon L–5. The intervertebral disc space between L–5 and S–1 was markedly narrowed. Osteoarthritic changes mostly in the right sacro-iliac joint were also noted. Dr. C. W. Stallar, in a report from the Laird Memorial Hospital, dated September 4, 1962, stated that it would be difficult to rehabilitate plaintiff because of his inability to read or write and recommended a 20% partial permanent disability and that the patient make a special effort to return to work.

Plaintiff was examined January 14, 1963, by Dr. Harold H. Kuhn, specialist in orthopedic surgery, who found straight leg raising test positive bilaterally at 45° and a decrease in sensation over the left leg and foot. There was rather pronounced tenderness over the left calf, thigh and buttock. There was also marked tenderness at the lumbosacral joint and in the adjacent muscles from L–1 to 4. Plaintiff had full spinal motion and the impressions were lumbosacral and myofascial strain, sciatic neuritis of the left lower extremity. Dr. Kuhn felt that a 20% partial permanent disability was fair.

Dr. Randolph L. Anderson, specialist in internal medicine, on January 14, 1963, found on examination certain limitations of motion of the spine. He did not believe there was any disc herniation and felt that a partial permanent disability rating of 20% was fair.

Dr. Salvador Rodriquez, in examining plaintiff for the West Virginia Department of Welfare on April 9, 1963, concluded that he was able to do moderate physical work outside of a dusty environment and that he could perform physical work for the ADC program. The report described plaintiff as obese, having a slight degree of emphysema and suffering from osteoarthritis of the lumbar sacral spine.

Plaintiff was examined June 11, 1963, in the orthopedic clinic of the Beckley Memorial Hospital with the report concluding that he was suffering from mild degenerative osteoarthritis of the lumbar spine more apparent at the distal third and at the level of L5–S1, with narrowing of L5–S1 interspace; however, there was no neurological evidence of nerve root irritation from the lower extremities. His hyperesthesia of the entire left lower extremity was described as atypical and not corresponding to his complaints.

In a report dated September 17, 1963, Dr. J. A. Robinson, specialist in internal medicine, found possible diabetes mellitus. The diabetes mellitus was confirmed in a report of Dr. John S. Cook, specialist in internal medicine, Stevens Clinic Hospital, dated November 25, 1963. It was Dr. Cook's opinion that, in spite of the normal exercise electrocardiogram, plaintiff was suffering from ischemic heart disease with low cardiac reserve. He did not think, considering plaintiff's diabetic condition, that he should get a job operating machinery which would endanger others.

In a report, dated October 18, 1963, Dr. C. H. Goodykoontz, general practitioner, described plaintiff as suffering from (1) diabetes mellitus, (2) hypertension, (3) coronary insufficiency, (4) arthritis lumbar spine, and (5) obesity, and stated that he was presently unable to work. It was his opinion that rehabilitation seemed likely with proper treatment. In a report to Dr. Goodykoontz by Dr. J. A. Robinson, dated April 14, 1964, it was noted that plaintiff undoubtedly had a rather severe type of chronic low back disability and that he was also evidently a diabetic of moderate severity. He was advised to follow a reducing and diabetic type diet and it was observed that his blood pressure and diabetes should be closely watched.

Plaintiff received an orthopedic consultative medical examination at the Grace Hospital, Welch, West Virginia, on May 25, 1964. Some tenderness in the lumbar and lumbosacral regions were noted. Forward bending was within 8 inches of the floor and lateral flexion was satisfactory. Hyperextension lacked 5 degrees of being complete and he complained of discomfort in lifting, bending, stooping and squatting, though he did them fairly well. X-rays revealed changes of a degenerative nature, particularly in the lumbosacral region. These were felt to give him mild disability.

Plaintiff was again examined at the Grace Hospital on June 9, 1964. This examination was rather complete with the diagnosis being (1) chronic back strain syndrome, (2) obesity, (3) diabetes mellitus, mild, adult keto-acidosis resistant type, and (4) anxiety reaction associated with above. Dr. G. E. Irvin, in his comment, stated that the essential problem was one of a compensation back strain syndrome in a person of probable limited intelligence and motivation.

In a report dated January 27, 1965, Dr. Goodykoontz indicated that there had been a deterioration in plaintiff's physical condition and that in his opinion he was unable to do gainful work. The Silicosis Medical Board, in a report dated February 23, 1965, found plaintiff to be suffering from first stage silicosis which they did not feel impaired his capacity to work.

■ In deciding whether or not the Secretary's determination regarding plaintiff's ability to engage in substantial gainful activity is supported by substantial evidence, the Court must examine not only the objective medical findings of the examining and treating physicians, including their diagnoses and expert medical opinions, but the subjective evidence of pain and disability as well as plaintiff's educational background, work history and present age. Underwood v. Ribicoff, supra; Dillon v. Celebrezze, 345 F.2d 753 (4th Cir. 1965).

■ In the instant case plaintiff has met his burden of showing an inability to return to his usual arduous occupation of coal mining; the burden then shifted to the Secretary to show that there is generally available for him employment for which he is fit and qualified. Torres v. Celebrezze, 349 F.2d 342 (1st Cir. 1965); Ray v. Celebrezze, 340 F.2d 556 (4th Cir. 1965); Wimmer v. Celebrezze, 355 F.2d 289 (4th Cir. 1966).

Not only is plaintiff a fifty year old illiterate who has never engaged in any but the most laborious of occupations, but the record is also indicative of his rather limited intelligence. In the Disability Determination and Transmittal Report (R–86), dated March 20, 1964, the examiner noted that plaintiff "was not very comprehensive and questions had to be

stated very simply before he could understand." Likewise in a Report of Contact (R–99), dated October 3, 1963, the claims representative observed that, "He was not very comprehensive and I had to state. questions in very simple language before he understood me."

Plaintiff testified as to his subjective symptoms of pain as follows, (R–57, 58):

"Q. Can you tell me what discomfort you have? I know you have back trouble. Is it all the time or does it come and go?

"A. Well, it's there all the time but the more stirring around I do, like walking. I mean if I sit down a great long time, if I stay down in the rocking chair in the house and go to sleep, well, I have to get up and maybe stir around a little. It don't make no differ- ence what position I'm in, it ac- tual hurts. I can be laying down and if I'm laying down in the bed sleeping and it will wake me up. It will get to hurting me so bad, I can't sleep.

"Q. It even hurts you while you are sleeping?

"A. Yes, sir. You know in cloudy weather or when its gets real cold in the winter time, it gets to hurting so bad I can't sleep. I have to get up and put hot towels on.

"Q. Do you say your back hurts you all the time?

"A. Yes, it hurts all the time.

"Q. Is it worse sometimes than at others?

"A. Oh, yes, sir. It's a lot worse sometimes when it's rainy and cloudy weather, when it's warm and when the sun shines, it hurts, but not near as bad. When I do a lot of stirring around and drive about 25 or 30 miles, it will hurt.

"Q. It hurts your back?

"A. Yes, sir, it hurts it."

It has been determined that pain unaccompanied by any objectively ob- servable symptoms which is, nevertheless, real to the sufferer and so intense as to be disabling will support a claim for disa- bility benefits. Ber v. Celebrezze, 332 F.2d 293 (2d Cir. 1964). The evidence establishes that plaintiff is suffering from a degenerative osteoarthritic condi- tion of the lower back and although, as Dr. Irvin observed, a compensation syn- drome may be present the evidence is rather convincing that this is a painful situation that places definite limits on plaintiff's ability to do many types of work.

In his report the hearing exam- iner was of the opinion that it would be reasonable to assume that weight reduc- tion would improve plaintiff's general condition and that the pain caused by the arthritic condition would be lessened. This, of course, is conjecture and specula- tion on the examiner's part. Neverthe- less, while this may be, the record also indicates that plaintiff's income is so meager that he cannot afford the special foods of a diabetic diet and at the same time feed his wife. Certainly, if a person is suffering from a self-induced afflic- tion, that is readily correctable, he should not be considered for disability; how- ever, speculation as to what theoretically might happen should not be used as a ba- sis for denial of an otherwise deserving claim.

Dr. Carroll E. Smith, who testified as an expert vocational witness, was of the opinion that despite his impairments and limited education, plaintiff could perform certain jobs; among these he listed presser feeder in the clothing industry, bottle inspector in the soft drink indus- try, packaging machine supplies distribu- tor in the tobacco industry and light jani- torial work. He stated that these jobs were available within a 100 mile radius of plaintiff's home.

Under the standard of Wimmer v. Celebrezze, supra, 355 F.2d 294, the Secretary does not have to show that a particular employer has a job available for a claimant, nor need he show that employment exists within a specific geo-

graphic boundary; however, it does require that,

"Every type of labor—and every individual laborer—has a practical mobility, a market in which this type of labor and this particular individual may realistically be expected to offer his services, and we think the Secretary should be required to show that types of work within the background and residual capacities of the claimant exist within this area."

As a practical matter, the Secretary has failed in this instance to meet this test.

■ It has already been judicially recognized that employers are concerned with substantial capacity, psychological stability, and steady attendance in the selection of their employees, that their health and liability insurance costs will not be unduly increased. Thomas v. Celebrezze, supra. This consideration is an important factor in the labor market, and one seeking employment who cannot measure up to it is undoubtedly handicapped, especially in areas where a labor surplus exists. This Court will take judicial notice of the fact that in the geographical area of plaintiff's residence, where he has spent most of the productive years of his life—the Pocahontas Coal Fields of Southern West Virginia—great unemployment has been created in the coal mining industry in recent years by reason of the mechanization of the coal mines. Recognizing this fact, the state and national governments have enacted legislation and promulgated various programs designed to ameliorate the hardships thus created. The unemployment, however, persists.

Therefore, even if the type of light jobs detailed by the vocational expert are found to exist, as projected by the vocational expert, to say that this plaintiff, suffering from a painful back condition, diabetes, silicosis, possible heart trouble and high blood pressure, could successfully compete for such jobs in the limited and restricted labor market available to him with job seekers having no such impairments is exalting fantasy over reality. To the practical mind such an hypothesis cannot be accepted.

Viewing the record as a whole, as we must, it is concluded that, considered in combination, the plaintiff's impairments are such as to preclude him from following gainful activity, and that the Secretary's decision to the contrary is not supported by substantial evidence. Thus, the plaintiff is entitled to a period of disability and disability insurance benefits upon his application filed herein on October 3, 1963. The Secretary's Motion for Summary Judgment is accordingly denied and the plaintiff's like Motion is granted.