Raymond S. HALL, Plaintiff,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.

Civ. No. 9-196.

United States District Court
D. Maine, S. D.

June 28, 1968.

**490**

Ralph I. Lancaster, Jr., Fred C. Scribner, Jr., Portland, Me., for plaintiff.

Lloyd P. LaFountain, U. S. Atty., Edward G. Hudon, Asst. U. S. Atty., Portland, Me., for defendant.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This is an action brought under Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 401 et seq. (1964) for review of a "final decision" of the Secretary of Health, Education and Welfare affirming the denial by a Social Security Administration hearing examiner of plaintiff's application for the establishment of a period of disability and for disability insurance benefits under the provisions of Sections 216(i) and 223 of the Act. It is admitted that plaintiff has exhausted his administrative remedies. In accordance with the statute, the Secretary has filed as part of his answer a certified copy of the administrative record, including a transcript of the evidence upon which the findings and decision are based. Both parties have moved for summary judgment, and have filed briefs and presented oral argument in support of their motions.

■■■ The bounds of this Court's review of the Secretary's determination are delineated by Section 205(g) of the Act, which provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *." Substantial evidence has been repeatedly defined as not necessarily a preponderance of the evidence, but more than a scintilla. "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole." Celebrezze v. Bolas, 316 F.2d 498, 501 (8th Cir. 1963); Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). The Court's function is limited to determining "whether the administrative findings are adequate in law and premised upon substantial record evidence. Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary." Rodriguez v. Celebrezze, 349 F.2d 494, 495–496 (1st Cir. 1965). Nevertheless, it is said that the courts should not "abdicate their traditional functions; they cannot escape their duty to scrutinize 'the record as a whole' to determine whether the conclusions reached are rational" and to insure that the Secretary has not acted "arbitrarily or capriciously." Thomas v. Celebrezze, supra 331 F.2d at 543; Morton v. Gardner, 257 F.Supp. 67, 70 (S.D.W.Va. 1966). See generally, Whittier v. Gardner, 263 F.Supp. 670, 672 (D.Me.1967).

The record here reveals that the plaintiff, Raymond S. Hall, was born on July 6, 1908 in Massachusetts, that he completed four years of college and three years of seminary training and that he is an ordained Episcopal clergyman. He was married in 1934 and served from 1934 to 1938 as an assistant at a church in Fitchburg, Massachusetts. For the next four years he was rector of St. John's Episcopal Church in Lowell, Massachusetts. During World War II plaintiff was an army chaplain with the 502nd Regiment of the 105th Airborne Division, known as the "Screaming Eagles." At that time he participated in combat parachute jumps with his unit,

was wounded by shrapnel, and was captured by the Germans but escaped and eventually made his way back to this country. After the war plaintiff served for a year and a half as chaplain at the Seamen's Club in Boston and then for several years as director of the Seamen's Church Institute in New York City. In this latter position he supervised some 300 employees in a multi-million dollar operation. In 1960 he resigned from his position at the Seamen's Church Institute and became rector of Trinity Episcopal Church in Portland, Maine. He retired from that post on January 1, 1963 and has not performed any substantial gainful activity since. Since his retirement plaintiff has been found to be totally disabled by the Episcopal Church Pension Fund and the Veterans Administration, and he currently receives 100% disability pensions from both of these agencies.

Plaintiff filed an initial application for Social Security disability benefits on July 29, 1963. This was denied on September 20, 1963, and upon reconsideration the Social Security Administration reaffirmed its denial on June 27, 1964. Plaintiff did not take any further action on this application, but on October 21, 1964 filed another application. In this second application he alleged that as of January 31, 1963 he was disabled within the meaning of the Act. The Social Security Administration denied the application on January 13, 1965 and the denial was affirmed after reconsideration on September 29, 1965. Upon plaintiff's request, a hearing was held before a Social Security Administration hearing examiner on June 27, 1966, at which plaintiff and his personal physician, Dr. William F. Taylor of Falmouth, Maine, testified in his behalf and various medical reports and other documents were admitted into the record. The hearing examiner rendered his decision on November 21, 1966, holding that plaintiff was not disabled within the meaning of the Act. Plaintiff's request to the Appeals Council of the Social Security Administration for review of the hearing examiner's decision was denied on June 22, 1967, whereby the decision of the hearing examiner became the "final decision" of the Secretary and subject to the present review.

Although plaintiff has documented many physical complaints, the main ground for his claim of disability is a nervous condition, described by different doctors as a "chronic anxiety reaction," a "psychoneurosis," a "moderately severe anxiety tension state," and a "severe psychoneurotic disorder." At the hearing plaintiff testified that he is extremely nervous much of the time, that at times he gets the "shakes" and suffers from headaches, sleeplessness, bowel problems and extreme depression. He said that his nervous condition was greatly aggravated whenever he undertook any affirmative responsibility such as practicing his profession, or on occasion when he drove his automobile. He stated that this nervous condition had first come into existence as a result of his wartime experiences and that it had progressively worsened until in 1960 on the advice of the Grace Medical Group, Brooklyn, New York he resigned from his position at the Seamen's Church Institute. Plaintiff testified that it was also on the advice of the Grace Medical Group that he finally gave up his position as rector at Trinity Church, Portland in January 1963. He stated that in recent years both prior and subsequent to his final retirement he had consulted numerous physicians relative to his problems and that he had not received any substantial relief. Plaintiff emphasized that his nervous and physical symptoms appeared chiefly when he was exposed to pressure or responsibility in or out of his profession and that he was unable to perform any substantial employment. In this connection he related that after his retirement from his rectorship at Trinity, he had attempted to preach some sermons on a part-time ba-

sis at a small mission in Winthrop, Maine, but that after two Sundays he had been unable to continue because of greatly intensified nervous symptoms, including severe · headaches and the "shakes." He did, however, admit that he was able occasionally to assist in non-speaking roles at communion services, that he was generally able to drive his automobile, to take moderately long walks, to attend occasional Rotary Club meetings and to do chores around the house and errands to local stores. He also testified that he spent a portion of each summer at his camp in Denmark, Maine and that in recent winters he has driven to Florida to spend some time there with his mother, although on his last trip he required some assistance with the driving because of his nervous condition.

The medical evidence submitted to the hearing examiner may be summarized as follows: Dr. Taylor, a general practitioner with some specialty in internal medicine, testified that he had treated plaintiff since December 18, 1964 and that in his opinion plaintiff was suffering from severe psychoneurotic symptoms with frequent severe agitation and associated depression. He also stated that he had had plaintiff admitted to the hospital in July 1965 for what he believed to be a heart attack and again in September 1965 for abdominal cramps. He said that he had prescribed various drugs, including Mellaril and Serax, both tranquilizers, to alleviate some of plaintiff's symptoms and that he had, after consultation with plaintiff's attorney, recommended that plaintiff be seen by Dr. Alphonse Telfeian, a Portland psychiatrist. He also expressed his opinion that many of plaintiff's physical symptoms such as high blood pressure, bowel problems and headaches stemmed from his psychoneurotic condition. It was Dr. Taylor's unequivocal opinion that plaintiff's psychoneurosis would not improve, that the condition was permanent, and that it prevented plaintiff from doing any substantial gainful activity. In response to the trial examiner's questioning, Dr. Taylor elaborated on his opinion by stating that he felt that plaintiff would be unable to adhere to any fixed schedule or any set program or to function on a steady basis, but that he might be able to perform some intermittent work in his profession so long as no set program were involved. Dr. Taylor further testified that he had not considered whether plaintiff might be able to perform the work of an outside salesman where no fixed schedule were involved, and that he might be able to do such work. He later added that if pressure or steady hours were involved, plaintiff would be unable to function in any employment. His overall diagnosis was that every time the plaintiff had to face any kind of responsibility he would "fall apart," and get cramps, pain, tenseness and headaches.[1]

In addition to the testimony of Dr. Taylor, the record contains reports of numerous other doctors who examined plaintiff during the pertinent time interval. Dr. C. B. Huber, a psychiatrist, who examined plaintiff on March 27, 1963 at St. Petersburg, Florida, diagnosed plaintiff's nervous problem as an "anxiety reaction" and stated that "[o]verall evaluation of this patient is that of a chronic anxiety reaction for a prolonged period of time, associated in various degrees and intensities definitely and directly with his GI complaints." He further commented, "It is believed that this Minister is incapable of carrying on his duties in his parish."

Dr. Philip S. Fogg, Jr., a Portland psychiatrist, who examined plaintiff on June 19, 1963, diagnosed plaintiff's problem as an "Anxiety state; psycho-

---

1. In addition to Dr. Taylor's testimony before the hearing examiner, the record contains a letter from Dr. Taylor dated March 25, 1966 in which he stated that in his opinion, "Rev. Hall suffers from a constant unimproved severe psychoneurosis which is not going to improve" and that "his present condition is permanent and prevents him from doing any substantial gainful activity."

neurosis with depressive episodes. Irritable bowel syndrome. Essential hypertension," and at the end of his report noted emphatically "Inadequate to carry on profession!"

The record contains two reports by Dr. H. Phillip Hampton, an internist of Tampa, Florida, who examined plaintiff on April 5, 1963 and on February 21, March 9 and April 30, 1964. In a Social Security Administrative Medical Report dated July 2, 1963, Dr. Hampton's conclusion was: "Disabled by reason of angina, headaches, abdominal pain and anxiety." In a report dated June 12, 1964, Dr. Hampton stated that his diagnosis from his initial examination was a "hypertensive cardiovascular disease with moderate cardiac hypertrophy and coronary insufficiency" and that plaintiff had "migrainous headaches, abdominal pain due to a spastic bowel syndrome which were somatic manifestations of a moderately severe anxiety tension state." He stated that it was his opinion that "this combination of diseases disabled him from performing his duties as a clergyman" but that he hoped that plaintiff would be able to resume part-time work in the fall of 1964. Dr. Hampton referred plaintiff to Dr. Marvin S. Hardin for a psychiatric evaluation.

In a telegram dated March 28, 1966 and submitted to the hearing examiner through plaintiff's attorney, Drs. Edwin J. Grace and Francis J. Robinson, of the Grace Medical Group, stated that plaintiff had been under their care from April 1953 until October 1964, during which period he had suffered from "severe psychoneurosis and perods [sic] of depression which became progressively worse and disabling." They stated that plaintiff had retired from the ministry partly on their recommendation and that he also suffered from "hypertension, myocardial infarction, hyperglycernia dnd [sic] * * * various gastrointestinal disorders." The doctors concluded, "We would expect his disabilities to become progressively worse and disabling."

The record also contains two reports from Dr. Grace, one dated August 8, 1963 and another January 2, 1964. In the former, Dr. Grace gave 12 diagnoses of plaintiff's various complaints including "Hypertensive cardio-vascular disease with myocardial ischemia * * * Psychoneurosis, severe * * * Headaches, migrainous and other vascular, severe; much worse past year, * * * Insomnia * * * Depression; tension state." In the latter report Dr. Grace expressed his opinion that plaintiff's condition had not improved since his last report, that plaintiff "is not able to perform any type of work" and that "[t]he resumption of work would tend to further impair his health."

Dr. Albert Grish, a psychiatrist who examined plaintiff on June 6, 1964, summarized plaintiff's problems as follows: "There is no doubt about the severe anxiety this man expresses. The reason for it is not quite clear. He may have some organic disorders, but they do not seem to be the major problem. I have more the feeling that Mr. Hall reacted to the point where he feels that he did enough for humanity and the country, why shouldn't they do something for him. The anxiety then, can be explained only because he could not quite survive financially, if he did not get more disability. This, of course, is speculation. * * *" His diagnosis was, "Psychoneurotic reaction 000–x° 1, Anxiety reaction, severe."

Another psychiatrist, Dr. P. Dachslager, examined plaintiff at the Veterans Administration Center, Togus, Maine, on June 2, 1964. His diagnosis was "Anxiety reaction, chronic, moderately severe." He stated that he felt that plaintiff would benefit by outpatient therapy with a qualified psychiatrist.

Plaintiff was seen by Dr. Marvin S. Hardin, the psychiatrist to whom he was referred by Dr. Hampton, in Tampa, Florida, on February 21, March 9, March 24, April 30, 1964. In his report, dated July 9, 1964, Dr. Hardin stated that he felt that "[o]n the patient's part, psychiatric consultation was really seen of help only in helping to further qualify him for the status of Total Dis-

ability. * * *" However, he went on to state, "While this whole pattern contains evidence of conscious exaggeration and some degree of purpose, its intrinsically thorough-going neurotic quality, occurring in the involution years and showing features of early agitated (involutional) depression, effectively eliminated for me the consideration of simulation or malingering." His diagnosis was, "Early Agitated (involutional) Depression, occurring in a compulsive personality type, with psychophysiologic and somatic conversion features. This illness is chronic in nature, and both the motivation and available ego-strength are low, making the prognosis for any substantial improvement poor." Dr. Hardin concluded, "In my opinion, he is not capable of any sustained productive activity," and recommended supportive psychotherapy.

Dr. Ray L. Whitney, in a report dated November 3, 1964, stated that he had examined plaintiff on October 27, 1964 at the Veterans Administration office in Portland. His diagnosis was, "Psychoneurosis – Anxiety Reaction – Severe."

Dr. Alphonse Telfeian, the Portland psychiatrist to whom plaintiff was referred by Dr. Taylor, had plaintiff under psychotherapy on June 2 and 22, July 9, August 20, September 24, October 22 and November 12, 1965. His diagnosis of plaintiff's condition was *"Severe Psychoneurotic Disorder, Mixed Type*, with spells of agitated depression." In his opinion plaintiff was "suffering from an illness which disables him to perform his usual work or any other type of substantial gainful activity" and plaintiff was "unable to perform substantial services with reasonalbe [sic] regularity."

The record also contains a letter dated March 22, 1966 from Dr. Thomas C. Garrett, an internist of Sarasota, Florida. Dr. Garrett stated that plaintiff had been a patient of his for the past two winters and that he suffered from "Migraine headaches, Spastic Bowel, Diverticulosis of the Colon and has Diabetes Mellitus." He opined that plaintiff "has a variety of medical disabilities which prevent him from preforming [sic] any substantial service with regularity in competitive employment or self employment for which he is fitted by age, educational attainment, training, experience, and physical and mental capabilities." The doctor stated in summary, "When one adds up all of these conditions, and has known this man personally, it must be stated positively that the Reverend Hall is totally and permanently disabled." [2]

Finally, the record contains a rather unusual exchange of letters between the hearing examiner and Dr. Jack R. Ewalt, a Boston psychiatrist. Three months after the hearing, the hearing examiner wrote to Dr. Ewalt and asked him to point out that medical evidence in the record which would support and that which would not support the hearing examiner's assumed tentative finding that plaintiff was essentially not disabled within the meaning of the Act. Dr. Ewalt was also asked to comment from the objective medical evidence as to whether there were in fact any incapacitating limitations placed on plaintiff by reason of his nervous condition. Accompanying the hearing examiner's letter was the disability file including the above-summarized medical reports, as well as a summary of the hearing testimony prepared by the hearing examiner. This last was not inserted in the official record and is not in the record before

---

2. Another letter from Dr. Garrett, dated April 19, 1967 was submitted to the Appeals Council in connection with plaintiff's request for review of the hearing examiner's decision. In this letter Dr. Garrett stated that plaintiff's "chief trouble comes from nervous tension and difficulty in facing crises, etc." and that

"[t]his is manifested by migraine headaches, the jitters, and bowel upsets." He wrote that he knew plaintiff well and that he "certainly is not malingering." He expressed optimism as to plaintiff eventually being able to assume more responsibility without "folding up."

this Court. Dr. Ewalt replied by letter dated September 26, 1966 in which he stated that certain of the reports and exhibits would support the hearing examiner's tentative statement, while others would not. He then commented,

The total picture is that of a person with a number of physical and psychiatric symptoms, none of sufficient severity to keep him from fishing, attending meetings of Rotary Clubs, going to Florida for vacations, and at times participating in the religious services in a minor role. There is also an increasing intensity of the symptoms, and repeated contentions by the patient that he is entitled to disability payments. On the basis of the evidence submitted I would conclude that this man has some mild to moderate mental and nervous impairment as a result of his condition, but that he is not impaired as severely as many persons who are gainfully employed in the professions and in occupations of lesser responsibility. However, there are specific nervous symptoms present, and they may produce mild to moderate impairment, but how much disability is a matter for you to judge.

The two letters together with a list of Dr. Ewalt's professional qualifications were introduced into the record by the hearing examiner over the strenuous objection of plaintiff's counsel. This objection was based on the subjective factors in the hearing examiner's synopsis of the hearing testimony and the suggestive nature of the questions posed to Dr. Ewalt. It also appears that plaintiff was never personally examined by Dr. Ewalt, nor was there any opportunity for plaintiff's counsel to cross-examine Dr. Ewalt or to obtain clarification of his replies to the hearing examiner's inquiries.

Upon this record, the hearing examiner concluded that plaintiff had not shown that he was "disabled" within the meaning of the Act.[3] Having reviewed with care the entire record, this Court must conclude that the findings of the hearing examiner are not supported by substantial evidence and that his decision must be reversed.

For purposes relevant here, Sections 216(i) and 223 of the Act define "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i) (1) (A), 423(c) (2) (A) (1964). As this Court recently observed, there really are two steps to a finding of disability: first, a finding of a "medically determinable physical or mental impairment" and, second, a finding that the impairment results in an "inability to engage in any substantial gainful activity." Whittier v. Gardner, 263 F.Supp. supra at 675; Thomas v. Celebrezze, supra, 331 F.2d at 545. In the determination of whether a physical or mental impairment exists, it is settled law that an objective test must be applied. *Id.* However, in ascertaining whether the physical or mental impairment results in an inability to engage in substantial gainful activity, the test is a subjective one. *Id.* In other words, although a medically determinable impairment must be found to exist by means of objective criteria, in determining the effect of the impairment on the claimant, "the emphasis on the individual requires consideration of subjective reactions." Dvorak v. Celebrezze, 345 F.2d 894, 895 (10th Cir. 1965). "[T]he abstract 'average' man is not the criterion. The inquiry must be directed to the particular claimant; not to people in general or even claimants in general."

---

3. The hearing examiner did find that plaintiff had met the earnings requirement of the Act as of January 1963, and that he continued to meet this requirement up to the date of the hearing examiner's decision. This finding is not controverted by either party in this Court.

Thomas v. Celebrezze, supra; Whittier v. Gardner, supra.

Turning then to the first question, whether or not plaintiff has shown a medically determinable physical or mental impairment, the uncontradicted evidence is that plaintiff is suffering from a substantial psychoneurotic disorder accompanied by physical problems such as spastic bowel, migraine headaches and abdominal cramps. While Drs. Grish and Ewalt express some doubts as to the disabling effect of this condition, all the doctors confirm its existence. In short, it cannot be seriously controverted on this record that plaintiff has shown that he is subject to a medically determinable impairment arising mainly from his nervous disorder, but complicated by his physical problems.

The question then is whether plaintiff's impairment is sufficiently severe to preclude him from any substantial gainful activity. As stated above, the test here is a subjective one, namely whether this particular plaintiff is, in fact, unable to engage in substantial gainful activity as a result of his particular impairments, regardless of the effect which these impairments might have on another individual. The hearing examiner, after reviewing the evidence, concluded that plaintiff "is not precluded from working due to his anxiety, that he is in fact not motivated to return to his calling or engage in some other type of work primarily due to his receipt of sufficient monetary benefits * * * that [plaintiff's] impairments, either singly or in combination, have not reached that level of severity as to preclude light physical remunerative work, which would be compatible with his vocational and educational background."

In arriving at his conclusion, the examiner ignored the opinions of the physicians who actually examined plaintiff and who were unanimous to the effect that he is unable to engage in his clerical profession or in any other substantial occupation. Plaintiff's personal physician, Dr. Taylor, who had treated plaintiff over an extended period of time, gave his unequivocal opinion to this effect. Dr. Huber stated that he believed plaintiff "is incapable of carrying on his duties in his parish." Dr. Fogg found plaintiff "[i]nadequate to carry on [his] profession!" In Dr. Hampton's opinion, "this combination of diseases disabled him from performing his duties as a clergyman." Drs. Grace and Robinson, who had had plaintiff under their care for over ten years, were also positive in their conclusion that plaintiff "is not able to perform any type of work." Dr. Hardin, recognized by the examiner as a "Board-qualified" psychiatrist, in a comprehensive report after extended psychiatric consultation, wrote, "In my opinion, he is incapable of any sustained productive activity." Dr. Hardin further stated that the "intrinsically thorough-going neurotic quality" of plaintiff's complaints "effectively eliminated for me the consideration of simulation or malingering." Dr. Telfeian, who had plaintiff under psychotherapy over a period of several months, stated without qualification that plaintiff's illness "disables him to perform his usual work or any other type of substantial gainful activity." Dr. Garrett was also of the view that plaintiff is "totally and permanently disabled." Of the examining physicians, only Dr. Grish, on the basis of a single examination, expressed some doubt as to the degree of plaintiff's incapacity. But even Dr. Grish gave no opinion that plaintiff was capable of working and conceded that his reservations as to plaintiff's good faith were no more than "speculation." [4]

4. The examiner's decision does not make clear the extent to which he relied upon Dr. Grish's report in concluding that plaintiff was not disabled but was, in effect, malingering. It is significant, however, that in his analysis of the medical evidence, the examiner misquoted Dr. Grish's report, stating that plaintiff had told Dr. Grish "What I want I am going to get," whereas actually Dr. Grish had written, "In a way, he looks very determined, *as if he would say* 'What I want I am going to get.'" (Emphasis supplied.)

In concluding that plaintiff was not so severely affected by his nervous condition as to be unable to engage in substantial gainful activity, it is evident that the examiner placed major reliance upon Dr. Ewalt's post-hearing report. As has been noted, plaintiff's counsel objected vigorously to the introduction of this report into the record, and here urges that it be stricken as improperly admitted. This Court has serious doubts as to the administrative propriety of soliciting such an ex parte opinion, without providing to plaintiff any opportunity for cross-examination or other clarification of the views expressed. *Compare*: 20 C.F.R. § 404.927; Parrish v. Ribicoff, 195 F.Supp. 930 (E.D.Pa. 1961). However, even if Dr. Ewalt's report is permitted to remain in the record, it expresses no view which would justify the examiner in finding as he did. On the basis of the material submitted to him, Dr. Ewalt concluded that plaintiff *"is not impaired as severely as many persons who are gainfully employed in the professions and in occupations of less responsibility*. However, there are specific nervous symptoms present, and they may produce mild to moderate impairment, *but how much disability is a matter for you to judge."* (Emphasis supplied.) It is evident that the test applied by Dr. Ewalt was that of the "average" man, while as has been stated, the inquiry must properly be directed to the particular claimant. Whittier v. Gardner, supra, 263 F.Supp. at 675; Thomas v. Celebrezze, supra, 331 F.2d at 545. In short, Dr. Ewalt expressed no opinion as to the ability or inability of this particular plaintiff to engage in substantial gainful activity. In fact, he appears expressly to have left this crucial determination to the examiner.

While, of course, the doctors' opinions are not necessarily binding upon the hearing examiner in determining the ultimate issue of disability within the meaning of the statute, 20 C.F.R. § 404.1526; Thomas v. Celebrezze, supra, 331 F.2d at 545–546; Chandler v. Celebrezze, 225 F.Supp. 1001, 1006 (S. D.Ill.1964), their expert opinions are relevant to show plaintiff's inability to engage in gainful activity. Thomas v. Celebrezze, supra; Thompson v. Celebrezze, 334 F.2d 412, 414 (6th Cir. 1964). Nor is the examiner entitled arbitrarily to reject the unanimous opinions of admittedly qualified examining physicians and to substitute therefor his own unsupported contrary conclusion. Redden v. Celebrezze, 361 F.2d 815 (4th Cir. 1966); Thompson v. Celebrezze, supra; Teeter v. Flemming, 270 F.2d 871, 874, 77 A.L.R.2d 636 (7th Cir. 1959); Mullen v. Gardner, 256 F.Supp. 588, 590–591 (E.D.N.Y.1966).

The Secretary urges that plaintiff has not met the additional burdens imposed upon claimants by the recent amendments to Section 223 of the Social Security Act, which became effective January 2, 1968. P.L. 90–248, § 158(b), Jan. 2, 1968. In the respects here relevant these amendments place on a claimant for Social Security benefits the burden of establishing not only that he is incapable of carrying on his previous work, but also that he cannot engage in any other kind of substantial gainful work which exists significantly in the national economy; define a "physical or mental impairment" as one resulting from anatomical, physiological, or psychological abnormalities demonstrable by medically accepted clinical and laboratory diagnostic techniques; and require a claimant to furnish such evidence of disability as the Secretary may require.[5] Concededly,

5. The relevant provisions of Section 223 now read as follows:
    (d) (2) For purposes of paragraph (1) (A)—
    (A) an individual * * * shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work

these amendments are in terms made applicable to this case.[6] However, the Court is satisfied that upon this record plaintiff has sustained not only the burden that was his at the time of his hearing, but he has also sustained any new and heavier burden which these amendments may impose upon him.[7]

█ With regard to plaintiff's burden of establishing inability to engage in any substantial gainful work which exists to a significant extent in the national economy,[8] the record shows convincingly that the ailment which has afflicted him is not localized to one particular part or function of mind or body, but affects the entire individual. Here it is not a question of plaintiff being able to perform one particular job while not being able to perform another. The

evidence demonstrates that plaintiff is disabled from performing any type of activity which involves even moderate amounts of pressure or responsibility.[9] Nor is there any reason to believe that the medical reports which disclose plaintiff's impairment do not reflect the results of "medically accepted clinical and laboratory diagnostic techniques." Of course, in the field of mental and psychological disease medically accepted diagnostic techniques do not often resemble the test-tube and stethoscope techniques utilized to detect physiological deterioration. However, it is not suggested that the methods utilized by able psychiatric specialists are not recognized as accepted clinical diagnostic techniques. Finally, the record plainly establishes that plaintiff has furnished to Secretary overwhelming evidence of the ex-

---

exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

\* \* \* \* \*

(3) For purposes of this subsection, a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques.

\* \* \* \* \*

(5) An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require.

6. See P.L. 90–248 § 158(e), Jan. 2, 1968.

7. It should be here noted that had plaintiff made a showing sufficient under the pre-1968 Act but not sufficient under the Act as amended, due process would require that this Court remand his case to the Secretary so that plaintiff might have an opportunity to sustain his new burden of proof.

8. Prior to the recent amendments to the Act, there was a substantial body of case

law to the effect that once a Social Security claimant had shown that he was incapable of performing work which he had performed in the past, he was entitled to a determination of disability unless the Secretary could show that there existed some substantial other work which the claimant could perform. See, e. g., Morton v. Gardner, supra, 257 F.Supp. at 72; Mims v. Celebrezze, 217 F.Supp. 581, 586 (D.C.Colo.1963); Tiley v. Celebrezze, 235 F.Supp. 142, 143 (N.D.Ohio 1964). It is conceded that this case law was repudiated by the above-cited statutory amendments.

9. At the hearing, the hearing examiner questioned Dr. Taylor closely about plaintiff's ability to take on a job with less definite hours and less responsibility than the ministry, specifically some sort of outside salesman job. In response, Dr. Taylor stated that he thought that plaintiff would not be able to work in a factory because of the set program that would be involved. Concerning a travelling sales job, Dr. Taylor said that he could not say whether plaintiff could perform this work, that "maybe he could, I don't know." It was on this testimony that the hearing examiner seized in his opinion. In doing so he ignored Dr. Taylor's testimony on cross-examination to the effect that he could not think of any salesman's job that plaintiff would be able to do over an extended period of time and that he did not feel that plaintiff could work a full eight-hour day at any job.

istence of the disability for which he makes claim.

In the view of this Court, the evidence in this case overwhelmingly shows that plaintiff is disabled within the meaning of the Act, and the Secretary's decision to the contrary is not supported by substantial evidence. Accordingly, plaintiff's motion for summary judgment is granted; defendant's motion for summary judgment is denied; and this case is remanded to the Secretary with directions that plaintiff be granted a period of disability and disability insurance benefits in accordance with the views herein expressed.[10]

---

10. In view of the Court's disposition of the case, it is not necessary to rule upon plaintiff's charge of bias on the part of the hearing examiner. Suffice it to say that this Court after a reading of the entire record and transcript is left with the definite impression that the hearing examiner did entertain a preconception on the issues that was detrimental to his fair and objective consideration of the matter before him.